RECEIVED

JAN 3 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

WESTERN AMERICAN                           CIVIL ACTION NUMBER: 99-2217
TRANSPORTATION, LLC

VERSUS                                     JUDGE DOHERTY

ROBBIE MORROW, ET AL                       MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING

Pending before this Court is a Motion for Summary Judgment filed on behalf of National Union Fire Insurance Company of Louisiana [hereinafter sometimes referred to as "National Union"] seeking judgment in its favor:

- declaring that there is no coverage under the policy it issued to Western American Transportation, L.L.C. for liability resulting from the actions of Western American Transportation, L.L.C. which were alleged to have taken place; and

- dismissing the direct-action claims which have been asserted against it by the defendants, Robbie Morrow, Johnny Montemayor, Houston Trucklines and/or Western Intermodal Container Services [hereinafter referenced collectively as "Morrow & Montemayor"].

Morrow & Montemayor oppose the motion for summary judgment. All briefing has been completed and the motion has been taken under advisement by this Court. For the following reasons, the motion will be granted in its entirety.

## FACTS

This case has a long and colorful history and involves a myriad of facts which, at various times, have been both relevant and seriously disputed. Due to a Partial Settlement reached between Western American and Morrow & Montemayor, however, many of the disputes have not been – and will not be – presented to this Court for resolution. Those facts which are not pertinent to the instant motion and those disputes which are no longer live will not be reiterated here. The following facts are both relevant to the issues presented in the motion and are undisputed.

The plaintiff in this action, Western American, is a transportation company which still exists, but is no longer operating.[1] At all pertinent times, however, it operated out of an office in Lafayette, Louisiana. The issues presented by National Union's motion arise out of actions taken by Western American in December, 1999.

Specifically, on the sixth day of that month, Western American filed a Complaint arising out of a business dispute with Morrow & Montemayor. In its Complaint, it named as defendants Robbie Morrow (in her individual capacity, d/b/a Houston Trucklines, and d/b/a Western Intermodal Container Services) and Johnny Montemayor ( in his individual capacity, d/b/a Houston Trucklines, and d/b/a Western Intermodal Container Services). The Complaint alleged, *inter alia*, that Morrow & Montemayor were diverting business due to, and accounts receivable owned by, Western American to their own use and benefit rather than transferring them to Western American, as Western American alleges the contracts required. Based upon these allegations of fact, Western

---

[1]     At one point, it was suggested to this Court that Western American had declared bankruptcy. However, Western American's counsel has clarified his client's current status and indicates that Western American is not in bankruptcy. Brief on behalf of Western American Transportation, L.L.C. [doc. 510], at 1, ¶ 1.

-2-

American alleged that Morrow & Montemayor were liable for conversion and for theft. Western American's Complaint was accompanied by a Verification executed by one of its employees, Glenn Bodin. Mr. Bodin attested that he was the person who supplied the information contained in the Complaint and that the allegations were "true and correct."

On the basis of these and other allegations of alleged potential loss, Western American sought the issuance of a writ of sequestration by this Court. The writ requested by Western American was overly broad, however, and this Court refused to issue the order as proposed. Once the scope of the proposed writ was narrowed, so as to address only those items allegedly owned by, or due to, Western American, this Court issued the requested writ. On Friday, December 10, 1999, a Deputy United States Marshal executed the writ with the assistance of Western American's counsel. At some point during the day, the Deputy Marshal and Mr. Jackson contacted one or more judicial officers' chambers – that of Judge Harmon (under whose authority the writ was domesticated in Texas) and/or that of this Court – for an interpretation as to the scope of the writ. While the only evidence that has been presented (the deposition testimony of Deputy U.S. Marshal Michael Nagle) is unclear as to the source of the instructions he received, it is clear that he came away from those contacts with an impression as to the proper scope of the writ and its execution, and that he acted to keep the scope of the seizure within the scope of the writ as he understood it. Nonetheless, and despite this Court's express refusal to include Morrow & Montemayor's business records and personal funds within the scope of the requested writ, Western American's counsel, nonetheless, convinced the Deputy to seize those very categories of documents in addition to those which were specifically included within the writ.

The following Monday, December 13, 1999, Morrow & Montemayor filed a Motion to Dissolve the Writ, which was granted by this Court on that day. Within a month of the filing of the Complaint, both the plaintiff and this Court were placed on notice that Morrow & Montemayor objected vehemently to the actions taken by Western American before, during and after December 10, 1999. Morrow & Montemayor particularly contested the allegation that they had engaged in conversion and/or theft, and filed counterclaims, including ones for defamation and wrongful sequestration.[2]

At all material times, the record has been clear that, as between the parties, the proper characterization of Morrow & Montemayor's actions was seriously disputed, and that Western American stood by its original allegations and characterization. Over two years after the suit was initiated, deposition testimony was provided by counsel for Western American, Konrad Jackson, to the effect that the claims of "theft and conversion" were the basis of Western American's lawsuit against Morrow & Montemayor.[3] In the same deposition, John Anderson, trial counsel for Western American, offered a stipulation on the record that all of the allegations in the Complaint were believed by counsel and by Western American to be true and correct.[4] Approximately one year after that – and approximately one month prior to the commencement of the trial of this matter – Western American's trial counsel filed into the record a Joint Pre-Trial Order – containing his signature – in which he continued to maintain that the factual allegations of theft and conversion in the Complaint

---

[2]     Answer and Counterclaim [Doc. 13].

[3]     Transcript of Deposition of Konrad Jackson, attached as Exhibit 2 to Memorandum in Support of Motion for Summary Judgment [Doc. 497], at 86-87.

[4]     Id. at 49.

-4-

were "true" and "accurate."[5]

Trial of the breach of contract claims began on Monday, March 17, 2003 and continued thereafter. Two days later, Western American entered into a Partial Settlement with Morrow & Montemayor. The Partial Settlement, by contrast with Western American's prior assertions of fact (made both through counsel and through its own employees) contains a stipulation that the allegations of theft and conversion "including those in paragraph twelve (12) of the complaint are not true." The parties to the Partial Settlement went on to stipulate that the allegations of theft and conversion "were not made knowing they were false."[6]

During all times pertinent , Western American was insured by National Union. Specifically, National Union issued in favor of Western American a Commercial General Liability Policy bearing No. CGL 173-74-91 AR, with effective dates from August 1, 1999 through August 1, 2000. When Morrow & Montemayor filed their original answer and counterclaim, they alleged that National Union provided insurance coverage for Western American's liability for alleged wrongful seizure of property and defamation. Pursuant to its obligations under the CGL policy, National Union provided Western American with a defense (and, thus, with counsel) on the counterclaims asserted by Morrow & Montemayor against Western American, but reserved its right to contest coverage. A defense was provided notwithstanding the reservation of rights. Later, National Union intervened into this matter seeking a declaratory judgment that the claims asserted by Morrow & Montemayor are not covered under the CGL policy. Specifically, National Union seeks that:

---

[5]     Pre-Trial Order [Doc. 450], at 3.

[6]     Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2.

-5-

- the Court adjudicate and declare that National Union's commercial general liability policy number CGL 173-74-91 AR does not furnish insurance coverage to Western American with reference to the claims made against it in the captioned matter, and

- the Court declare that National Union has no further defense obligation as a result of the lack of coverage.[7]

When Morrow & Montemayor answered the intervention, they asserted a direct action counterclaim against National Union, the pertinent allegations of which consist of the following:

- National Union Fire Insurance Company of Louisiana intervened in this case seeking a declaration that its policy affords no coverage to Western American Transportation, L.L.C.

- As more fully explained in their opposition to National Union's motion for summary judgment, and in accordance with the Louisiana Direct Action Statute, National Union is responsible under its policy of insurance for the damages which were sustained by counterclaimants.[8]

During the negotiations leading up to the Partial Settlement, National Union instructed Western American on at least three occasions that it had a contractual duty to cooperate with National Union in its defense and in the settlement of any claims against it.[9] National Union further notified Western American that it considered the inclusion, in the Partial Settlement, of certain factual stipulations to constitute a violation of its duty to cooperate with National Union and requested that Western

---

[7]     Complaint in Intervention [Doc. 204], at 7.

[8]     Answer to Intervenor's Complaint and Counterclaim Against National Union Fire Insurance Company [Doc. 301], at 3. National Union's second request – concerning the defense obligation – would appear to be moot at this time. It is, at any rate, not at issue in the pending motion.

[9]     Statement of Uncontested Material Facts in Support of Motion for Summary Judgment, at 2, ¶ 12. *See also* Rule 56.2 Statement [Doc. 505] filed on behalf of Morrow & Montemayor, stating that the "statement of uncontested facts filed by National Union is generally correct" but challenging the characterization of one fact not relevant here.

American not include any stipulation of fact in its settlement with Morrow & Montemayor.[10] Western American has acknowledged, on the record, that it entered into the settlement despite these admonitions and without further consulting National Union.[11] Moreover, in the Partial Settlement Western American agreed – and, later, demanded of National Union – that counsel provided by National Union withdraw from representation of Western American.[12]

## PROCEDURAL HISTORY

The relevant claims asserted herein are those originally asserted between Western American and Morrow & Montemayor, and those between Western American's insurer, National Union, and Morrow & Montemayor. Western American's Complaint contained the allegation that Morrow & Montemayor were liable for theft and conversion of certain funds, and Morrow & Montemayor responded by filing a counterclaim asserting various claims, including allegations that Western American's allegations of theft amounted to defamation. After National Union intervened in this action seeking a judgment declaring there is no insurance coverage for the counterclaims asserted by Morrow & Montemayor against Western American,[13] Morrow & Montemayor counterclaimed against National Union asserting direct action claims for coverage on their claims against Western

---

[10]    Id.

[11]    Id.

[12]    Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2.

[13]    Complaint in Intervention [Doc. 204].

-7-

American.[14]

In light of Western American's dual role as both plaintiff and counter-defendant, the company's retained counsel represented it in one capacity (*i.e.* that of plaintiff) while counsel retained by National Union on behalf of Western American defended it on the counterclaims. This division of counsel continued through the commencement of trial, on March 17, 2003, on the contract claims between Western American and Morrow & Montemayor. Two days later, on March 19, 2003, the plaintiff and defendants presented this Court with an executed document entitled "Partial Settlement." The settlement was "partial" because Morrow & Montemayor specifically reserved whatever claims it might have against National Union. Now pending is National Union's Motion for Summary Judgment seeking a declaration of no coverage and/or no liability on those reserved claims.

## PARTIAL SETTLEMENT

The Partial Settlement, together with the legal effect of that settlement, play a central role in the analysis of the pending motion. The analysis begins with a close examination of the contents of the document.

The three-page Partial Settlement contains unexceptional language declaring that claims asserted by the signatories (Western American and Morrow & Montemayor) against each other and against various third parties are to be dismissed and forever relinquished,[15] but veers into the unusual by specifically reserving as against Western American's insurer, National Union, three claims

---

[14]     Answer to Intervenor's Complaint and Counterclaim Against National Union Fire Insurance Company [Doc. 301].

[15]     *See* Partial Settlement, attached as Exhibit 3 to Memorandum of Law in Support of Motion for Summary Judgment [Doc. 497], at ¶¶ 1, 2, 5, 6, 8.

-8-

asserted by Morrow & Montemayor; one for defamation and two for what was designated as "sequestration/abuse of process."[16] In the second and third sentences of Paragraph 2 of the Partial Settlement, the release of claims was expanded to include Morrow & Montemayor's Reserved Claims against Western American *if* it was possible to do so without imperiling Morrow & Montemayor's claims against National Union. Specifically, Paragraph 2 of the Settlement reads as follows:

> Morrow and Montemayor dismiss, with prejudice, all claims against WAT which were based on breach of contract and all other claims for monetary damages and mental anguish, pain and suffering for 1) defamation and 2) sequestration/abuse of process, which claims are reserved (hereinafter the "Reserved Claims"). To the extent that they may do so without prejudice to the liability of [Western American's] insurer(s), and only to that extent, Morrow and Montemayor also release the Reserved Claims against [Western American]. If the liability of [Western American], if any can be proved, is a precondition of coverage by its policy(ies) of insurance, the claims against [Western American] for defamation and sequestration/abuse of process, said Reserved Claims are preserved.[17]

The conditional nature of the language used in Paragraph 2 creates uncertainty as to the legal effect of the Partial Settlement. This uncertainty derives from the fact that National Union can only be liable under the policy issued to Western American, for amounts which Western American becomes "legally obligated to pay as damages." The applicable policy language reads:

---

[16]   While the parties (in both the Partial Settlement and the briefing) refer to "sequestration/abuse of process" as only one claim, the applicable Louisiana and Texas law clearly establish that abuse of process is a very different and separate claim from that for wrongful sequestration. This Court will treat them as such hereafter and considers that Morrow & Montemayor have reserved three claims, not two. The wrongful sequestration and abuse of process claims will sometimes hereafter be referenced collectively as the "seizure-related claims."

[17]   Id. at ¶ 2.

-9-

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insuring Agreement

        a.     We will pay those sums that the insured becomes legally obligated to pay as damages . . .

\* \* \*

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1.     Insuring Agreement
        a.     We will pay those sums that the insured becomes legally obligated to pay as damages . . .[18]

Thus, the language agreed upon by the parties to reserve claims against Western American *if necessary* to preserve Morrow & Montemayor's claims against National Union raises a question as to whether, and to what extent, the release of claims against Western American affects the Reserved Claims against National Union and what role, if any, Western American continues to have in this litigation. Fortunately, the Louisiana courts have addressed this question extensively within the context of Louisiana's Direct Action Statute, and have provided clear guidance as to the legal effect of the agreement between Western American and Morrow & Montemayor which is reflected in the Partial Settlement.

The Louisiana First Circuit's recent opinion in <u>Sumrall v. Bickham</u>, 2003-1252 (La.App. 1 Cir. 9/8/04), 887 So.2d 73, *writ denied*, 2004-2506 (La. 1/7/05), 891 So.2d 696, contains an extended discussion and analysis of the rights and obligations which flow from a plaintiff's dismissal of an insured tortfeasor while retaining claims against its insurer. This Court finds the opinion

---

[18]     CGL Policy of Insurance, attached as Exhibit 1 to Memorandum in Support of Motion for Summary Judgment [Doc. 497], at 1, 4.

persuasive as to the current state of law on that narrow issue.

In Sumrall, the plaintiff settled with the insured tortfeasor (Mr. Bickham), expressly reserving his rights against all others, specifically including Mr. Bickham's insurer. After the settlement, the insurer sought summary judgment on the basis that its insured could no longer be held "legally liable" to the plaintiff and, therefore, that its potential liability to Mr. Sumrall had been extinguished when the settlement was confected. The motion was denied by the district court and the first circuit denied the insurer's writ application. The Louisiana Supreme Court granted a writ application and remanded the case to the First Circuit to rule on the question of whether, as a general matter, "a plaintiff's settlement with an insured eliminates an insurer's obligation to pay the plaintiff according to the terms that the policy would otherwise require." Id. at 4, 887 So.2d at 76.

The Court began its analysis by acknowledging that the question turns on the intent of the parties. "Louisiana law provides that the scope of a compromise agreement extends to the differences clearly comprehended by the parties, not to differences that the parties never intended to include." Id. at 6, 887 So.2d at 77. The parties "clearly comprehended and intended that [the claimant] would maintain his rights to pursue [the] liability insurer. . . ." Id. at 6, 887 So.2d at 77. The Court recognized that the insurer "cannot be independently liable [] without the liability of [the insured] first being found by the trial court or a jury or by an acknowledgment of liability on the part of its insured," Id. at 9, 887 So. 2d at 78, but concluded that "[a]n insured-tortfeasor can be 'legally liable' for the victim's damages, even though he cannot be cast in judgment due to his release from liability." Id. at 9, 887 So.2d at 79. According to the First Circuit, this outcome is both justified and mandated by the Direct Action Statute, La. Rev. Stat. 22:655, which creates solidary liability on the part of an insurer with its insured tortfeasor. Id. at 10-11, 887 So.2d at 79.

-11-

The Sumrall opinion, although issued by an intermediate appellate court, accurately reflects the state of the law in Louisiana, as applied to the facts of this case, and is consistent with longstanding jurisprudence issued by other appellate courts as well as the Louisiana Supreme Court. *See, e.g.,* Rollins v. Richardson, 2002-0556 (La. 12/4/02), 833 So.2d 921; Futch v. Fidelity & Casualty Company of New York, 246 LA. 688, 166 So.2d 274 (1964); Finnie v. LeBlanc, 2003-1013 (La.App 3 Cir. 3/10/04), 875 So.2d 71; Gasquet v. Commercial Union Insurance Company, 391 So.2d 466 (La.App. 4 Cir. 1980). While this Court is not Erie-bound to apply intermediate appellate decisions as the law of Louisiana, it is permitted to take guidance from those decisions deemed to be persuasive. As noted above, this Court finds that the Sumrall analysis and conclusions are persuasive as to the state of Louisiana law and provide a valid indicator of how the Louisiana Supreme Court would rule on the legal effect of the Partial Settlement here. As such, as using the standard set forth in Sumrall, the legal effect of the Partial Settlement here turns on the intentions of the parties to that contract.

Concerned that just such an analysis would be required, and recognizing the potential for confusion to result from the conditional language in Paragraph 2 of the Partial Settlement, this Court conducted two separate conferences in Chambers on March 19, 2003 – the day the Partial Settlement was confected – for the purpose of eliciting the intentions that prompted the ambiguous language contained in Paragraph 2 and the intended effect on Western American's status in this action. The descriptions provided by counsel for Morrow & Montemayor concerning the intentions of his clients were substantially identical in both conferences. Moreover, Ms. Morrow and Mr. Montemayor were present in Chambers during the second conference and expressed their agreement that their claims against Western American would remain live only to the extent necessary to permit them to proceed

-12-

against National Union.

*First chambers conference*:

The Court: You release your reserved claims?

Mr. Rountree: To the extent that it doesn't prejudice the liability of the insurers.

The Court: Prejudice the liability of the insurer. Okay. Let me make certain. *You are giving up – you are also giving up your claim of defamation and sequestration and abuse of process to the extent that it does not prejudice the liability of WAT's insurer.*

Mr. Rountree: Correct.

\* \* \*

The Court: So even as to the reserved claims which is the defamation and the sequestration/abuse of process, *to the extent that Morrow & Montemayor may do so without prejudice to the liability of WAT's insurer and only to that extent, Morrow & Montemayor also are releasing WAT from the defamation and the sequestration/abuse of process claim.*

Mr. Rountree: Correct.

\* \* \*

*Second chambers conference*:

Mr. Rountree (to Ms. Morrow):

If it would have the effect of releasing their insurance company, we are not releasing WAT. That's another way of saying the same thing. . . . You have to be concerned any time you make a settlement that you don't destroy your insurance coverage and this says that *if we can release WAT without affecting the insurance, we're doing so.*

Mr. Morrow: Oh, okay.

Mr. Rountree: But if it would affect the insurance, we're not.

Ms. Morrow: Okay.

The Court: Okay. And I can't comment to that or speak to that in any way. That's between you and your lawyer and the language that you-all want to put in there, but that's what he is talking about is why this language is here, okay?

Ms. Morrow: Okay.

\* \* \*

The Court: Mr. Montemayor, do you have any questions you want to ask? . . . I want to make certain the two of you understand and are comfortable with this.

Mr. Montemayor: Yes, I am.[19]

---

[19]     Transcript of Proceedings of March 19, 2003 [Doc. 474], at 569-70, 595, 610.

-13-

The Partial Settlement, together with the quoted excerpts from the March 19, 2003 transcript, make clear that the settlement was intended to permit the complete exit of Western American from this litigation *except* to the extent that its presence might be necessary to permit Morrow & Montemayor to recover against National Union for the reserved claims. Despite the language of the CGL Policy, Louisiana law precludes any effect on Morrow & Montemayor's claims against National Union by the release of Western American in this case because of the clearly expressed intent to reserve two specific claims against National Union. Both the language of the Partial Settlement and the expressed intent of the parties clearly provide for the full dismissal of Morrow & Montemayor's claims against Western American. Counsel for Morrow & Montemayor has acknowledged as much to this Court.[20] Therefore, this Court finds that the release by Morrow & Montemayor of their claims against Western American would not affect the Reserved Claims against National Union in light of the express intent to reserve those claims. As Morrow & Montemayor have clearly stated their intent to release Western American if this were the legal effect of the dismissal, this Court finds that the Partial Settlement had the effect of releasing *all* of Morrow & Montemayor's claims against Western American while preserving the defamation and seizure-related claims against National Union. With this ruling, all claims against Western American have been released by Morrow & Montemayor and this Court will recognize that fact formally in the order accompanying this ruling.

---

[20]     "If a release caused a loss of coverage, there would be no release of Western American, and dismissal of the reserved claims would not be appropriate. If the court were to conclude that Western American's allegations of theft and conversion were known to be false, there would be no coverage under the policy . . . Defendants' claims against WAT for defamation would still be subject to a valid dismissal. The same is true for the sequestration/abuse of process claim. If there is no insurance coverage for this claim, it would still be released." Defendants' Memorandum Addressing the Effect of Settlement [Doc. 503].

In addition to the release (and reservation) of claims, the Partial Settlement contains two

stipulations identified as factual stipulations related to the Reserved Claims against National Union:

> [Western American] stipulates that all allegations of theft and conversion, including those in paragraph twelve (12) of the complaint, are not true [hereinafter referred to as the "falsity stipulation"]; [and]
>
> It is a stipulation that [Western American] did not make the allegations of theft and conversion in paragraph twelve (12) of the complaint knowing they were false; rather, these allegations were based on a misunderstanding of the legal effect of paragraphs eleven (11) and thirty-one (31) of the lease agreement, exhibit seventy-three (73), introduced into evidence at the trial of the contract claim and counterclaim [hereinafter referred to as the "knowledge stipulation"].[21]

The two stipulations, and their legal effects, will be discussed more particularly below.

Finally, the parties to the Settlement declared their intention that counsel who had represented

Western American at trial would be removed from that representation and would not participate

further in the litigation of this matter.[22]

## APPLICABLE LAW AND ANALYSIS

In its motion, National Union seeks summary judgment in its favor on all claims which have

been reserved by Morrow & Montemayor and makes the following arguments in support of its

motion:

(a)     as to the defamation claim, to the extent that coverage ever existed, it has been

vitiated by collusion between Western American and Morrow & Montemayor for the

purpose of depriving National Union of an affirmative defense (*i.e.* the truth of

_____

[21]     Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2, ¶¶ 3, 4.

[22]     Id. at ¶ 7.

-15-

Western American's allegations of theft and conversion); and

(b)     as to the seizure-related claims, there is no coverage because the violations alleged by Morrow & Montemayor (i) do not constitute "accidents" under that portion of the policy and, therefore, are not covered by Coverage A *and* (ii) do not fall within the limited categories of coverage for intentional business acts provided by Coverage B under the policy.

Each of these arguments will be addressed separately below.

## I.     Summary Judgment Standards

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. Proc. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against

-16-

the adverse party." Fed. R. Civ. Proc. 56(e).

Of particular importance in this context is the allocation of the burden of proof. "If the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, then the movant can satisfy its summary judgment burden by submitting evidentiary documents that establish all of the elements of the claim or defense. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate." Resolution Trust Corp. v. Northpark Joint Venture, 958 F.2d 1313, 1322 (5th Cir. 1992), *cert. denied sub. nom.* Dannis v. Resolution Trust Corp., 506 U.S. 1048 (1993). The pending motion involves a request for dismissal pursuant to two affirmative defenses presented by an insurance company seeking to avoid a finding of coverage. Under the facts of this case, National Union bears the ultimate burden of proof at trial as to the two affirmative defenses upon which it relies here. Pursuant to Resolution Trust Corporation, it must submit evidence establishing all of the elements of its defense. Once that has been done, the burden will shift to Morrow & Montemayor to demonstrate that summary judgment is inappropriate.

## II. Interpretation of Insurance Contracts in Louisiana

The parties are in agreement that Louisiana law applies to the insurance contract at issue. The Fifth Circuit has provided a succinct description of the general rules of interpretation which apply to Louisiana insurance contracts:

> Under Louisiana law, interpretation of an insurance policy is subject to the general rules of contract interpretation which requires juridical determination of the common intent of the parties to the contract. The intent of the parties, as reflected by the words in the policy, determine the extent of coverage. We construe the words of an insurance policy by applying their 'general, ordinary, plain, and proper meaning . . . unless they have acquired a technical meaning.

> Exclusions to coverage contained in an insurance policy must be clearly and expressly set forth. When the language of an insurance policy is clear, it must be

-17-

enforced as written. If, however, the terms of the policy are ambiguous, they must
be construed against the drafter of the policy. Therefore, in the event the words
contained in an exclusionary clause are susceptible to greater than one reasonable
interpretation, we must adopt the interpretation that provides coverage to the insured.

Thermo Terratech v. GDC Enviro-Solutions, Inc., 265 F.3d 329, 334-35 (5th Cir. 2001) (internal

quotations omitted).

## III. Applicable Tort Law

The first of the two seizure-related torts asserted by Morrow & Montemayor is that of

wrongful sequestration, which focuses on the actions leading up to, and issuance of, the writ of

sequestration by this Court. Because the writ was issued in Lafayette, Louisiana, the act of

sequestration took place in the State of Louisiana and, therefore, Louisiana law will apply to this

tort.[23]

Rule 64 of the Federal Code of Civil Procedure grants authority to federal judges to order the

seizure of persons and/or property involved in federal litigation:

At the commencement of and during the course of an action, all remedies providing
for seizure of person or property for the purpose of securing satisfaction of the
judgment ultimately to be entered in the action are available under the circumstances
and in the manner provided by the law of the state in which the district court is held,
existing at the time the remedy is sought . . . . The remedies thus available include
arrest, attachment, garnishment, replevin, sequestration . . . .

Fed. R. Civ. Proc. 64. In Louisiana, there are specific prerequisites which must be met prior to the

issuance of a writ of sequestration:

A writ of attachment or of sequestration shall issue only when the nature of the claim

---

[23]     Morrow & Montemayor agree with this conclusion. "The writ was issued in
Louisiana pursuant to La. C. C. P. arts. 3501 *et seq.* To the extent that it was wrongfully issued,
Morrow and Montemayor have a claim for damages as provided by La. C.C.P. art. 3506." Morrow
and Montemayor are Entitled to Damages for Wrongful Sequestration and Abuse of Process [Doc.
468], at 2.

and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts shown by the petition verified by, or by the separate affidavit of, the petitioner, his counsel or agent.

The applicant shall furnish security as required by law for the payment of the damages the defendant may sustain when the writ is obtained wrongfully.

La. Code Civ. Proc. Art. 3501.

In Louisiana, a writ of sequestration "issues legally if the petitioner alleges adequate and valid grounds to support it, even if these are later disproved. . . . In the Louisiana cases holding that the writ of sequestration issued wrongfully, the plaintiffs failed to allege a necessary ground for issuance of the writ when they applied for it." Rocket Industries, Inc. v. Southern Tire & Supply, Inc., 706 F.2d 561, 563 (5th Cir. 1983). *See also* Hancock Bank v. Alexander, 256 LA. 643, 65-54, 237 So.2d 669, 672 (1970) (the issuance of a writ of sequestration "should not be availed of unless the conditions which permit them exist; that is to say, it is a prerequisite to their issuance that the proper grounds be alleged and sworn to."). Therefore, under the jurisprudence interpreting the Louisiana Code of Civil Procedure, sequestration is wrongful when a writ is issued without adequate supporting allegations made on behalf of the party moving for the writ.

The second tort reserved by Morrow & Montemayor is that of abuse of process. By contrast with the wrongful sequestration, abuse of process is directed at events which occur *following the issuance* of process. As the events of which Morrow & Montemayor complain with regard to the alleged abuse of process occurred in Texas, this Court assumes – as have the parties– that Texas law applies to those claims.

"It is critical that the process be improperly used *after* it has been issued. Texas law recognizes a cause of action for abuse of process where the original process, such as a writ, has been

-19-

abused to accomplish an end other than that which the writ was designed to accomplish. In other words, the original issuance of a legal process is justified, but the process itself is subsequently used for a purpose for which it was not intended." Hunt v. Baldwin, 68 S.W.3d 117, 130 (Tex.App.-Houston [14th Dist.] 2001) (emphasis in original). *See also* Snyder v. Byrne, 770 S.W.2d 65 , 67 (Tex.App. – Corpus Christi 1989) ("there must be an improper use of the process after its issuance"). In order to prove abuse of process, a plaintiff must demonstrate: "(1) that the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) that damage resulted to the plaintiff as a result of such illegal act." Brown v. NationsBank Corp., 188 F.3d 579, 587 (5th Cir. 1999). Morrow & Montemayor allege that Western American convinced Deputy United States Marshal Nagle to seize documents and things that were outside of the scope of the writ, specifically including Morrow & Montemayor's business documents, which this Court had deliberately excluded from the scope of the writ.

## IV.    Analysis

Before proceeding with an analysis of the arguments presented by National Union and by Morrow & Montemayor, it is important to note that, with regard to the coverage questions presented in the Motion for Summary Judgment, the facts are undisputed. The evidence demonstrating the facts supporting National Union's declaratory judgment action are either (a) already in the record, or (b) have been submitted by National Union in support of its motion. Moreover, Morrow & Montemayor have *not submitted any evidence* challenging the factual statements upon which National Union relies in support of its motion. Instead, Morrow & Montemayor rely solely upon argument made by counsel. Thus, as a preliminary matter, this Court notes that National Union has

-20-

sustained the first half of its burden of proof – that of demonstrating that there is no genuine issue of material fact – and the only challenge presented by Morrow & Montemayor is as to whether National Union is entitled to judgment as a matter of law.

Each of the Reserved Claims will be analyzed separately.

## A.    The Defamation Claim

With regard to the defamation claim, Morrow & Montemayor have alleged that the allegations contained in Western American's original Complaint (*i.e.* that Morrow & Montemayor engaged in theft and conversion) are defamatory in nature. Morrow & Montemayor seek damages to compensate them for the injuries allegedly resulting from the inclusion of those statements in the Complaint, as well as the publication of those allegations to one or more of their customers, both orally and in writing.

It is undisputed that, at all times prior to March 19, 2003, Western American maintained (to this Court, to the parties, and to its insurer, National Union) that its allegations of theft and conversion were true and correct. Notwithstanding these repeated assertions, Western American stipulated, on March 19, 2003, that its allegations of theft and conversion were not true. National Union alleges that this stipulation constitutes a violation of Western American's obligation to cooperate in National Union's defense in this suit and, on that basis, seeks dismissal of Morrow & Montemayor's defamation claim against it, together with a declaration that there is no coverage for the defamation claim.[24]

_____

[24]    It is crucial to identify National Union's argument properly. The argument is not directed at the substance or the merits of Morrow & Montemayor's defamation claim against Western American, nor is it directed at the question of whether there might, in the absence of fraud or collusion, have been coverage for Morrow & Montemayor's claims against Western American. To the contrary, National Union's argument assumes the possibility of the existence of a viable claim

-21-

### 1.    *Applicable Policy Provisions*

For purposes of this argument, the only pertinent policy provisions are those related to
Western American's duty to cooperate in its own defense. Relevant portions of this policy read:

> Duties in the Event of an **Occurrence,** Claim or **Suit**
>
> c.    You and any other involved **Insured** must:
>
> (3)    cooperate with us in the investigation or settlement of the claim or defense
> against the **suit.**[25]

### 2.    *Applicable Law Concerning the Duty to Cooperate*

The duty to cooperate with one's insurer in connection with the investigation, settlement

and/or defense of a lawsuit is one that has long been included as a standard in insurance contracts.

*See, e.g.,* National Union Fire Insurance Company of Pittsburgh, Pa v. Cagle, 68 F.3d 905 (5th Cir.

1995); King v. King, 253 LA. 270, 217 So.2d 395 (1968); Bourgeois v. Great American Insurance

Company, 222 So.2d 70 (La.App. 4 Cir. 1969); Freyou v. Marquette Casualty Company, 149 So. 2d

697 (La.App. 3 Cir.) *(en banc), writ denied,* 244 LA. 154, 150 So. 2d 771 (1963); Broussard v.

Broussard, 84 So.2d 899 (La.App. 1 Cir. 1956).

> A clause of this character is a perfectly reasonable one, framed with the object of
> protecting the insurance company against the risk of collusion between the assured
> and persons claiming damages for alleged torts, and is a material condition of the
> policy, the violation of which by the assured forfeits his right to claim indemnity

---

of defamation against its insured prior to the Partial Settlement and the possibility of a viable claim
of coverage against National Union which survived the release of Morrow & Montemayor's claims
against Western American. National Union specifically argues that the actions undertaken by
Western American and Morrow & Montemayor *in confecting the falsity stipulation* – not in
confecting the settlement itself – constitute effected fraud or collusion directed at harming National
Union's interests.

[25]       Exhibit 1 to Memorandum of Law in Support of Motion for Summary Judgment
(Commercial General Liability Policy, § IV Commercial General Liability Conditions), at 8 of 13.

under the policy.[26]

The duty of cooperation does not, of course, require that an insured engage in, or support, a fraud, misrepresentation, or untruth in order to maintain its coverage,[27] but it *does* require that an insured refrain from acting in a way that will *materially prejudice* its insured's interests.

> [T]here is a breach of a co-operation clause where the insured untruthfully or collusively assumes liability for the accident, or misrepresents the facts to the prejudice of the insurer.. . . it is generally held that it may be a breach of a co-operation clause where the insured, in fact to blame for an accident, gives the insurer an account thereof favorable to the defense, thereby misleading the insurer to its prejudice, especially where the insured, in the trial of the action against him, admits responsibility for the accident. [Moreover, a] modification or repudiation may constitute a breach if fraudulent or a result of a collusive attempt to help the injured person.[28]

\* \* \*

> The law is also well settled in Louisiana, that in order that there may be a breach of the condition requiring the insured to co-operate with the liability insurer, so as to avoid the latter's liability under the policy, the lack of co-operation, or the misrepresentation must be substantial and material to such an extent that it results in prejudice to the insurer in defending the case.[29]

However, and as has been recognized by the Fifth Circuit, if an insurer seeks to deprive *a third party*

---

[26]    Broussard, 84 So.2d at 901-02

[27]    *See* Broussard, 84 So.2d at 902 ("The assured . . . is under no obligation to permit a sham defense to be set up in his name, nor can he be expected to verify an answer which he does not believe to be true."); Freyou, 149 So.2d at 702, ("the purpose of the cooperation clause is simply to require the insured to disclose all the facts within his knowledge and otherwise to aid the company to determine its liability under the policy"); and Bourgeois, 222 So.2d at 76 ("It was not a failure of cooperation constituting a breach of this condition merely because the factual testimony given by Gorney did not support the affirmative defense of his insurer. The policy condition requiring co-operation of the insured is not breached merely by the insured's denial of the position taken by the insurer if that position is not factually true.").

[28]    Broussard, 84 So.2d at 903, *quoting* AMERICAN JURISPRUDENCE ON INSURANCE.

[29]    Bourgeois, 222 So.2d at 75.

-23-

to the insurance policy of the benefits of coverage, the mere proof of material prejudice is not enough. In order to avoid liability *to a third party* (that is, in order to constitute an affirmative defense on a direct action claim), an insurer must prove that the third party participated in fraud and/or collusion with its insured to the material prejudice of the insurer.

> [E]ven if a breach of the cooperation clause could be shown . . . this breach would not affect the [plaintiff's] rights, as a third-party claimant, to the proceeds of National Union's policy, absent fraud or collusion.[30]

Thus, while it is true that "the insured owes the insurer the duty of complying with the contract terms together with a general duty of performance in good faith," pursuant to Cagle, 68 F.3d at 912, National Union must prove that (a) the breach resulted from fraud or collusion between Western American and Morrow & Montemayor and (b) the breach was materially prejudicial.

### 3. Analysis

The collusion question raised by National Union derives from the inclusion, in the Partial Settlement, of the falsity stipulation. The only evidence as to the existence of fraud or collusion which has been presented is (a) the record of Western American's representations to this Court and (b) the Partial Settlement, which contains the falsity stipulation. The question is whether the falsity stipulation presents sufficient evidence of a failure to cooperate, including fraud and/or collusion between Western American and Morrow & Montemayor, to sustain National Union's request for a ruling that, to the extent there might have otherwise been coverage under the CGL policy on the defamation claim, it has been vitiated by Western American's failure to cooperate. This Court finds that, under the facts of this case, the answer is in the affirmative.

---

[30] Cagle, 68 F.3d at 912.

### i. Failure to Cooperate.

This Court finds that on its face, there has been a failure to cooperate with National Union by Western American, in at least two ways. First, Western American reached an agreement with Morrow & Montemayor that specifically included provisions of which National Union became aware prior to the Partial Settlement being executed and which National Union repeatedly instructed insured, Western American, not to include in its agreement with Morrow & Montemayor. This fact demonstrates a failure by Western American to cooperate with its insurer. Second, Western American stipulated to the existence of one of the four necessary elements of Morrow & Montemayor's defamation claim – that of the falsity of the original allegations – that had been in serious dispute, as a result of Western American's shifting representations to its insurer, this Court, the parties, and everyone associated with this lawsuit. By stipulating to facts that its insurer must vigorously dispute – and over the insurer's strenuous objections – Western American clearly violated its duty to cooperate as required by the provisions of the CGL policy.

### ii. Material Prejudice.

Western American's failure to cooperate clearly resulted in a material prejudice to National Union. The parties have not favored this Court with the benefit of any research on the definition of material prejudice, and this Court's independent research concerning the concept of "material prejudice" suggests that it is one which is often used by the Louisiana courts, but has not been defined. The only guidance this Court has been able to derive from the jurisprudence is several decades old.

> There is no showing that at that time the insurer was with regard to its liability *in a substantially different position than it would have been* if the initial statement procured from its insured by the adjuster had disclosed the same facts as those to

-25-

which the insured testified at the discovery deposition.[31]

Similarly, the <u>Bourgeois</u> court found it persuasive that the insurer had suffered no change in its position in the litigation as a result of its insured's actions. "There appears to have been no defense against the negligence of [the insureds] and Great American makes no contention that its position in that respect would have been any different. . . ." 222 So.2d at 75.

Morrow & Montemayor argue strenuously that no prejudice has accrued to National Union because the factual stipulation entered into by Western American was accurate. This argument grossly understates the effect of the stipulation, however, and understanding the scope of the effect of the stipulation begins with an understanding of the allegations themselves. The alleged defamation here does not stem from alleged *factual* statements but from statements *characterizing* Morrow & Montemayor's actions as *theft and conversion* (this characterization could be described as opinion by Western American and/or its counsel, or as legal conclusion argued and assumed by Western American and/or by its counsel). Thus, the truth of Western American's statements does not turn merely on the question of whether certain events actually occurred in the past – or certain things actually were said in the past, but upon whether, under the legal regime established by the array of contracts between the parties and Louisiana and Texas law, Western American had the ownership rights it believed it had, whether Morrow & Montemayor's actions in withholding funds from Western American were in conscious violation of that legal regime, and whether, as a matter of law, theft and/or conversion occurred.

At the time the Partial Settlement was reached, Western American had begun presenting its evidence as to the merits of its allegations against Morrow & Montemayor. The actions and

---

[31]     <u>Freyou</u>, 149 So.2d at 703 (emphasis added).

statements made by counsel and witnesses on behalf of Western American at trial suggested that it intended to continue putting on evidence of actions taken by Morrow & Montemayor supporting its characterization of Morrow & Montemayor's actions as theft and conversion – evidence which could (and, possibly, would) prove the allegations of theft and conversion made to be true. Western American, nonetheless, chose to enter a contradictory stipulation that the claims it had made at the commencement of this lawsuit as to Morrow & Montemayor's having committed theft and conversion, and that it had pursued vigorously for over three years – and was fully prepared and had been in the process of presenting evidence to take those allegations by trial to final judgment – were, in fact, *actually false.*

The "falsity stipulation" – because it declared that Western American believed the evidence it had gathered and the arguments it had marshaled not to constitute theft and conversion on the part of Morrow & Montemayor – seriously undermined National Union's ability to establish that necessary matter; the evidence, as well as the arguments available to its insured supporting the original allegations, were, as of the stipulation, called into serious question. Moreover, this outcome was not simply an unintended consequence of the settlement; it was the unavoidable and inescapable result and, thus, this Court can reasonably infer, in part, the exact intent of the parties in entering the falsity stipulation. If, as counsel repeatedly represented to this Court on and after March 19, 2003, the claims against Western American were being dismissed and only those claims against National Union were being reserved, then the stipulation could not have had any effect on *Western American's interests* and could not, therefore, have been included for any reason related to Morrow & Montemayor's claims against Western American. Once the Partial Settlement was confected, Morrow & Montemayor's only remaining claims were against National Union. Logically, thus, the

only impact of the falsity stipulation, then, was to those remaining claims.

Morrow & Montemayor, additionally, have acknowledged one intended effect against National Union's interests – that of establishing a condition precedent to Morrow & Montemayor's defamation claims against National Union – but they have not acknowledged that the falsity stipulation essentially declared that Western American had declared, by stipulation filed into the record, Western American was no longer willing to stand behind the evidence *that it had been in the process of presenting to this Court when the settlement was reached* and, thus, severely impacted National Union's ability to present that same evidence. Once Western American, as the party which had made the allegations against Morrow & Montemayor and on whose interpretation of the evidence the characterization was based, went on record as agreeing that its own allegations were false when they were made – and at every moment since they were made, notwithstanding the repeated assertions and stipulations to the contrary – the intent of Western American and Morrow & Montemayor was now defined, *to the detriment of National Union,* and the evidence Western American had gathered became far less valuable to National Union, as its ability to provide support for National Union's defense was greatly undermined.[32]

Had Western American and Morrow & Montemayor merely reached an agreement to settle their claims *and not included the falsity stipulation*, the trial would have ended on March 19, 2003, and this Court would have scheduled the Reserved Claims for trial as soon as possible, allowing

---

[32]     It would do well to note the unique nature of the defamation claim which, perhaps more than most non-criminal matters, encompasses intent and truth within its analysis, and the fact that the defamation claim arises out of contractual interpretation, which, also, encompasses intent of the parties. Truth is a defense to defamation; and what the parties might have intended within their contracts is pivotal to whether Morrow & Montemayor's actions under that contract could constitute theft and conversion, as alleged by Western American and complained of by Morrow & Montemayor.

-28-

National Union time to prepare for and to present its defense to Morrow & Montemayor's claims. In the absence of the falsity stipulation, National Union would have defended itself on the Reserved Claims, at least in part, by arguing the truth of the complained of claims and, thus, presenting the evidence gathered by Western American supporting the truth of Western American's allegations that Morrow & Montemayor engaged in theft and conversion, which, by necessity, would, in part key from the parties intent to the various contracts and, thus, whether Morrow & Montemayor's actions pursuant to that contract, as to Western American, constituted theft and conversion. Western American has now stipulated any such allegation is false – thus, undercutting National Union's primary defense. Without the falsity stipulation, the evidence would have been presented to this Court or to a jury for determination as to whether or not the allegations were true. The falsity stipulation precluded this sequence of events by creating a continuous, inherent conflict between the contractual and other evidence Western American had gathered and argued (and its characterization of that evidence in light of their intent under the contracts) and the falsity stipulation which suggested the evidence was not susceptible to the interpretation under which both Western American and National Union had operated for more than three years.

The stipulation clearly was directed at removing or severely impacting National Union's ability to defend against Morrow & Montemayor's claims, just as clearly, it has accomplished that end by forcing National Union to contend with an admission by its insured that would render futile any efforts to develop further evidence in support of the truth of its insured's allegations *precisely because Western American has renounced its belief in its original allegations*, and thus, evidenced its intent and interpretation of the underlying contracts and stipulated to that renunciation. Given the peculiar nature of a claim for defamation – which integrates the truth of the matter into the

elements of the claim – the reduction or loss of National Union's ability to establish or argue the truth of the allegedly defamatory statements could be devastating. Also, given the reality that the complained of allegations stem from interpretation of underlying contracts, Western American has, in effect, stipulated that because their claims were false, Morrow & Montemayor could not have committed theft or conversion *under those contracts*, as the signatories to those contracts agree that did not occur. Furthermore, Morrow & Montemayor have agreed the falsity stipulation was designed to create – and did create – an improvement in the legal status of Morrow & Montemayor's defamation claim against National Union. "The stipulation merely satisfies a legal condition precedent to an action for defamation in pleadings." [33] This Court finds that this change in position – resulting not from any action taken by National Union, but solely from a stipulation entered into by its insured – has resulted in material prejudice to National Union's interests in this litigation.

### iii.    Fraud.

This Court has ruled that Western American violated its duty to cooperate with its insurer, and that the violation materially prejudiced National Union's interests. However, as National Union seeks to extinguish the rights *of third parties* to the insurance contract, the question becomes whether this failure to cooperate resulted from fraud or collusion.[34] Fraud is defined in Article 1953 of the

---

[33]    Memorandum in Opposition to National Union's Third Motion for Summary Judgment [Doc. 504], at 6.

[34]    Cagle, 68 F.3d at 912. With regard to the question of collusion, the parties have assumed that the three definitions of collusion which appear in Footnote 6 in the Cagle decision – requiring the proof of either a secret agreement or an agreement that occurred *prior* to the institution of an action – are controlling here. A close review of Cagle, however, suggests that the Fifth Circuit's ruling is fact-specific and, thus, more limited than the parties have assumed; this conclusion is reinforced by longstanding Louisiana jurisprudence defining collusion much more broadly than the three definitions identified in Cagle. *See, e.g.,* In re Reed, 207 La. 1011, 22 So.2d 552 (1945); In re Steiner, 199 La. 500, 6 So.2d 641 (1942); Sere v. Darby, 118 La. 619, 43 So. 255 (1907); Babb

-30-

Louisiana Civil Code: "Fraud is a *misrepresentation* or a suppression of the truth made with the intention either *to obtain an unjust advantage for one party* or to cause a *loss or inconvenience* to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953. (emphasis added)

The posture of the parties to this motion – particularly the fact that the insurer and its insured now are at odds with one another and the insured has aligned its interests with Morrow & Montemayor to the detriment of the rights of the insurer – makes the fraud question both more difficult and more strained than it might otherwise be. The briefing does not reflect any effort, whatsoever, by counsel to address the thorny issues associated with the fraud analysis in light of the facts, the law, and the procedural history of this case. In the absence of assistance from the parties, this Court will make its best effort to do so based on the record presented.

As noted hereinabove, the stipulation that Western American entered with Morrow & Montemayor is directly and absolutely incompatible with the position Western American asserted throughout the course of this litigation right up to the point in time when it entered into the stipulation. The dramatic change in Western American's position gives rise to an important question: Is Western American speaking "the truth" now, or did it speak "the truth" when it initiated this action? It is only possible for one of the two positions to be true. Thus, as a function of logic, one of the two statements must be false, unless Western American was unaware of "the truth" at both times – which, if the legal conclusion is the issue, would be the case; but if the interpretation of the underlying contract is the issue, (and thus, the intent of the parties to that contract), Western

v. Boney, 30,443 (La.App. 2 Cir. 4/8/98), 710 So.2d 1132. In light of the conclusions reached concerning fraud, however, it is unnecessary for this Court to determine which definition of collusion would apply in this case.

-31-