RECEIVED

AUG 1 5 2006 C✓

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| WESTERN AMERICAN TRANSPORTATION, LLC | CIVIL ACTION NUMBER: 99-2217 |
| VERSUS | JUDGE DOHERTY |
| ROBBIE MORROW, ET AL | MAGISTRATE JUDGE METHVIN |

## AMENDED MEMORANDUM RULING

Pending before this Court is a Motion for Summary Judgment filed on behalf of National Union Fire Insurance Company of Louisiana [hereinafter sometimes referred to as "National Union"] seeking judgment in its favor:

- declaring that there is no coverage under the policy it issued to Western American Transportation, L.L.C. for liability resulting from the actions of Western American Transportation, L.L.C. which were alleged to have taken place; and

- dismissing the direct-action claims which have been asserted against it by the defendants, Robbie Morrow, Johnny Montemayor, Houston Trucklines and/or Western Intermodal Container Services [hereinafter referenced collectively as "Morrow & Montemayor"].

Morrow & Montemayor oppose the motion for summary judgment. All briefing was completed and the motion was taken under advisement by this Court. On December 29, 2005, this Court issued a Memorandum Ruling and Order granting the motion. In response thereto, Morrow & Montemayor filed a Motion to Reconsider which has been granted to permit this Court or respond to certain arguments set forth therein, primarily (a) to correct the legal analysis of the coverage defense as

applied to the defamation claim; and (b) to correct several substantial misstatements contained in the argument presented on the motion. For the following reasons, the motion for summary judgment was granted in its entirety.

## FACTS

This case has a long and colorful history and involves a myriad of facts which, at various times, have been both relevant and seriously disputed. Due to a Partial Settlement reached between Western American and Morrow & Montemayor, however, many of the disputes have not been – and will not be – presented to this Court for resolution. Those facts which are not pertinent to the instant motion and those disputes which are no longer live will not be reiterated here. The following facts are both relevant to the issues presented in the motion and are undisputed.

The plaintiff in this action, Western American, is a transportation company which still exists, but is no longer operating.[1] At all pertinent times, however, it operated out of an office in Lafayette, Louisiana. The issues presented by National Union's motion arise out of actions taken by Western American in December, 1999.

Specifically, on the sixth day of that month, Western American filed a Complaint arising out of a business dispute with Morrow & Montemayor. In its Complaint, it named as defendants Robbie Morrow (in her individual capacity, d/b/a Houston Trucklines, and d/b/a Western Intermodal Container Services) and Johnny Montemayor (in his individual capacity, d/b/a Houston Trucklines, and d/b/a Western Intermodal Container Services). The Complaint alleged, *inter alia*, that Morrow

---

[1] At one point, it was suggested to this Court that Western American had declared bankruptcy. However, Western American's counsel has clarified his client's current status and indicates that Western American is not in bankruptcy. Brief on behalf of Western American Transportation, L.L.C. [doc. 510], at 1, ¶ 1.

& Montemayor were diverting business due to, and accounts receivable owned by, Western American to their own use and benefit rather than transferring them to Western American, as Western American alleges the contracts between itself and Morrow & Montemayor required. Based upon these allegations of fact, Western American alleged that Morrow & Montemayor were liable for conversion and for theft. Western American's Complaint was accompanied by a Verification executed by one of its employees, Glenn Bodin. Mr. Bodin attested that he was the person who supplied the information contained in the Complaint and that the allegations were "true and correct."

On the basis of these and other allegations of alleged potential loss, Western American sought the issuance of a writ of sequestration by this Court. The writ requested by Western American was overly broad, however, and this Court refused to issue the order as proposed. Once the scope of the proposed writ was narrowed, so as to address only those items allegedly owned by, or due to, Western American, this Court issued the requested writ. On Friday, December 10, 1999, a Deputy United States Marshal executed the writ with the assistance of Western American's counsel. At some point during the day, the Deputy Marshal and Mr. Jackson contacted one or more judicial officers' chambers – that of Judge Harmon (under whose authority the writ was domesticated in Texas) and/or that of a Court in this venue – for an interpretation as to the scope of the writ. While the only evidence that has been presented (the deposition testimony of Deputy U.S. Marshal Michael Nagle) is unclear as to the source of the instructions he received, it is clear that he came away from those contacts with an impression as to the proper scope of the writ and its execution, and that he acted to keep the scope of the seizure within the scope of the writ as he understood it. Nonetheless, and despite this Court's repeated express refusal to include Morrow & Montemayor's business records and personal funds within the scope of the requested writ, Western American's counsel

convinced the Deputy to seize those very categories of documents in addition to those which were specifically included within the writ.

The following Monday, December 13, 1999, Morrow & Montemayor filed a Motion to Dissolve the Writ, which was granted by this Court on that day. Within a month of the filing of the Complaint, both the plaintiff and this Court were placed on notice that Morrow & Montemayor objected vehemently to the actions taken by Western American before, during and after December 10, 1999. Morrow & Montemayor particularly contested the allegation that they had engaged in conversion and/or theft, and filed counterclaims, including ones for defamation and wrongful sequestration.[2]

At all material times, the record has been clear that, as between the parties, the proper characterization of Morrow & Montemayor's actions was seriously disputed, and that Western American stood by its original allegations and characterization. Over two years after the suit was initiated, deposition testimony was provided by counsel for Western American, Konrad Jackson, to the effect that the claims of "theft and conversion" were the basis of Western American's lawsuit against Morrow & Montemayor.[3] In the same deposition, John Anderson, trial counsel for Western American, offered a stipulation on the record that all of the allegations in the Complaint were believed by counsel and by Western American to be true and correct.[4] Approximately one year after that (and approximately one month prior to the commencement of the trial of this matter) Western

---

[2] Answer and Counterclaim [Doc. 13].

[3] Transcript of Deposition of Konrad Jackson, attached as Exhibit 2 to Memorandum in Support of Motion for Summary Judgment [Doc. 497], at 86-87.

[4] Id. at 49.

American's trial counsel filed into the record a Joint Pre-Trial Order – containing his signature – in which he continued to maintain that the factual allegations of theft and conversion in the Complaint were "true" and "accurate."[5]

Trial of the breach of contract claims began on Monday, March 17, 2003 and continued thereafter. Two days later, Western American entered into a Partial Settlement with Morrow & Montemayor. The Partial Settlement, by contrast with Western American's prior assertions of fact (made both through counsel and through its own employees) contains a stipulation that the allegations of theft and conversion "including those in paragraph twelve (12) of the complaint are not true." The parties to the Partial Settlement went on to stipulate that the allegations of theft and conversion "were not made knowing they were false."[6]

During all times pertinent, Western American was insured by National Union. Specifically, National Union issued in favor of Western American a Commercial General Liability Policy bearing No. CGL 173-74-91 AR, with effective dates from August 1, 1999 through August 1, 2000. When Morrow & Montemayor filed their original answer and counterclaim, they alleged that National Union provided insurance coverage for Western American's liability for alleged wrongful seizure of property and defamation. Pursuant to its obligations under the CGL policy, National Union provided Western American with a defense (and, thus, with counsel) on the counterclaims asserted by Morrow & Montemayor against Western American, but reserved its right to contest coverage. Later, National Union intervened into this matter seeking a declaratory judgment that the claims

---

[5] Pre-Trial Order [Doc. 450], at 3.

[6] Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2.

asserted by Morrow & Montemayor are not covered under the CGL policy. Specifically, National Union seeks that:

- the Court adjudicate and declare that National Union's commercial general liability policy number CGL 173-74-91 AR does not furnish insurance coverage to Western American with reference to the claims made against it in the captioned matter, and

- the Court declare that National Union has no further defense obligation as a result of the lack of coverage.[7]

When Morrow & Montemayor answered the intervention, they asserted a direct action counterclaim against National Union, the pertinent allegations of which consist of the following:

- National Union Fire Insurance Company of Louisiana intervened in this case seeking a declaration that its policy affords no coverage to Western American Transportation, L.L.C.

- As more fully explained in their opposition to National Union's motion for summary judgment, and in accordance with the Louisiana Direct Action Statute, National Union is responsible under its policy of insurance for the damages which were sustained by counterclaimants.[8]

During the negotiations leading up to the Partial Settlement, National Union instructed Western American on at least three occasions that it had a contractual duty to cooperate with National Union in its defense and in the settlement of any claims against it.[9] National Union further notified Western American that it considered the inclusion, in the Partial Settlement, of certain factual stipulations to

---

[7] Complaint in Intervention [Doc. 204], at 7. National Union's second request – concerning the defense obligation – would appear to be moot at this time. It is, at any rate, not at issue in the pending motion.

[8] Answer to Intervenor's Complaint and Counterclaim Against National Union Fire Insurance Company [Doc. 301], at 3.

[9] Statement of Uncontested Material Facts in Support of Motion for Summary Judgment, at 2, ¶ 12. *See also* Rule 56.2 Statement [Doc. 505] filed on behalf of Morrow & Montemayor, stating that the "statement of uncontested facts filed by National Union is generally correct" but challenging the characterization of one fact not relevant here.

constitute a violation of its duty to cooperate with National Union and requested that Western American not include any stipulation of fact in its settlement with Morrow & Montemayor.[10] Western American has acknowledged, on the record, that it entered into the settlement despite these admonitions and without further consulting National Union.[11] Moreover, in the Partial Settlement Western American agreed – and, later, demanded of National Union – that counsel provided by National Union withdraw from representation of Western American.[12]

## PROCEDURAL HISTORY

The relevant claims asserted herein are those originally asserted between Western American and Morrow & Montemayor, and those between Western American's insurer, National Union, and Morrow & Montemayor. Western American's Complaint contained the allegation that Morrow & Montemayor were liable for theft and conversion of certain funds, and Morrow & Montemayor responded by filing a counterclaim asserting various claims, including allegations that Western American's allegations of theft amounted to defamation. After National Union intervened in this action seeking a judgment declaring there is no insurance coverage for the counterclaims asserted by Morrow & Montemayor against Western American,[13] Morrow & Montemayor counterclaimed against National Union asserting direct action claims for coverage on their claims against Western

---

[10] Id.

[11] Id.

[12] Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2.

[13] Complaint in Intervention [Doc. 204].

American.[14]

In light of Western American's dual role as both plaintiff and counter-defendant, the company's retained counsel represented it in one capacity (*i.e.* that of plaintiff) while counsel retained by National Union on behalf of Western American defended it on the counterclaims. This division of counsel continued through the commencement of trial, on March 17, 2003, on the contract claims between Western American and Morrow & Montemayor. Two days later, on March 19, 2003, the plaintiff and defendants presented this Court with an executed document entitled "Partial Settlement." The settlement was "partial" because Morrow & Montemayor specifically reserved whatever claims it might have against National Union. Now pending is National Union's Motion for Summary Judgment seeking a declaration of no coverage and/or no liability on those reserved claims.

## PARTIAL SETTLEMENT

The Partial Settlement, together with the legal effect of that settlement, play a central role in the analysis of the pending motion. The analysis begins with a close examination of the contents of the document.

The three-page Partial Settlement contains unexceptional language declaring that claims asserted by the signatories (Western American and Morrow & Montemayor) against each other and against various third parties are to be dismissed and forever relinquished,[15] but veers into the unusual by specifically reserving as against Western American's insurer, National Union, three claims

---

[14] Answer to Intervenor's Complaint and Counterclaim Against National Union Fire Insurance Company [Doc. 301].

[15] *See* Partial Settlement, attached as Exhibit 3 to Memorandum of Law in Support of Motion for Summary Judgment [Doc. 497], at ¶¶ 1, 2, 5, 6, 8.

asserted by Morrow & Montemayor; one for defamation and two for what was designated as "sequestration/abuse of process."[16] In the second and third sentences of Paragraph 2 of the Partial Settlement, the release of claims was expanded to include Morrow & Montemayor's Reserved Claims against Western American *if* it was possible to do so without imperiling Morrow & Montemayor's claims against National Union. Specifically, Paragraph 2 of the Settlement reads as follows:

> Morrow and Montemayor dismiss, with prejudice, all claims against WAT which were based on breach of contract and all other claims for monetary damages and mental anguish, pain and suffering for 1) defamation and 2) sequestration/abuse of process, which claims are reserved (hereinafter the "Reserved Claims"). To the extent that they may do so without prejudice to the liability of [Western American's] insurer(s), and only to that extent, Morrow and Montemayor also release the Reserved Claims against [Western American]. If the liability of [Western American], if any can be proved, is a precondition of coverage by its policy(ies) of insurance, the claims against [Western American] for defamation and sequestration/abuse of process, said Reserved Claims are preserved.[17]

The conditional nature of the language used in Paragraph 2 creates uncertainty as to the legal effect of the Partial Settlement. This uncertainty derives from the fact that National Union can only be liable under the policy issued to Western American, for amounts which Western American becomes "legally obligated to pay as damages." The applicable policy language reads:

---

[16] While the parties (in both the Partial Settlement and the briefing) refer to "sequestration/abuse of process" as only one claim, the applicable Louisiana and Texas law clearly establish that abuse of process is a very different and separate claim from that for wrongful sequestration. This Court will treat them as such hereafter and considers that Morrow & Montemayor have reserved three claims, not two. The wrongful sequestration and abuse of process claims will sometimes hereafter be referenced collectively as the "seizure-related claims."

[17] Id. at ¶ 2.

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insuring Agreement

        a.     We will pay those sums that the insured becomes legally obligated to pay as damages . . .

* * *

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1.     Insuring Agreement
        a.     We will pay those sums that the insured becomes legally obligated to pay as damages . . .[18]

Thus, the language agreed upon by the parties to reserve claims against Western American *if necessary* to preserve Morrow & Montemayor's claims against National Union raises a question as to whether, and to what extent, the release of claims against Western American affects the Reserved Claims against National Union and what role, if any, Western American continues to have in this litigation. Fortunately, the Louisiana courts have addressed this question extensively within the context of Louisiana's Direct Action Statute, and have provided clear guidance as to the legal effect of the agreement between Western American and Morrow & Montemayor which is reflected in the Partial Settlement.

The Louisiana First Circuit's recent opinion in <u>Sumrall v. Bickham</u>, 2003-1252 (La.App. 1 Cir. 9/8/04), 887 So.2d 73, *writ denied*, 2004-2506 (La. 1/7/05), 891 So.2d 696, contains an extended discussion and analysis of the rights and obligations which flow from a plaintiff's dismissal of an insured tortfeasor while retaining claims against its insurer. This Court finds the opinion

---

    [18] CGL Policy of Insurance, attached as Exhibit 1 to Memorandum in Support of Motion for Summary Judgment [Doc. 497], at 1, 4.

-10-

persuasive as to the current state of law on that narrow issue.

In Sumrall, the plaintiff settled with the insured tortfeasor (Mr. Bickham), expressly reserving his rights against all others, specifically including Mr. Bickham's insurer. After the settlement, the insurer sought summary judgment on the basis that its insured could no longer be held "legally liable" to the plaintiff and, therefore, that its potential liability to Mr. Sumrall had been extinguished when the settlement was confected. The motion was denied by the district court and the first circuit denied the insurer's writ application. The Louisiana Supreme Court granted a writ application and remanded the case to the First Circuit to rule on the question of whether, as a general matter, "a plaintiff's settlement with an insured eliminates an insurer's obligation to pay the plaintiff according to the terms that the policy would otherwise require." Id. at 4, 887 So.2d at 76.

The Court began its analysis by acknowledging that the question turns on the intent of the parties. "Louisiana law provides that the scope of a compromise agreement extends to the differences clearly comprehended by the parties, not to differences that the parties never intended to include." Id. at 6, 887 So.2d at 77. The parties "clearly comprehended and intended that [the claimant] would maintain his rights to pursue [the] liability insurer. . . ." Id. at 6, 887 So.2d at 77. The Court recognized that the insurer "cannot be independently liable without the liability of [the insured] first being found by the trial court or a jury or by an acknowledgment of liability on the part of its insured," Id. at 9, 887 So. 2d at 78, but concluded that "[a]n insured-tortfeasor can be 'legally liable' for the victim's damages, even though he cannot be cast in judgment due to his release from liability." Id. at 9, 887 So.2d at 79. According to the first circuit, this outcome is both justified and mandated by the Direct Action Statute, La. Rev. Stat. 22:655, which creates solidary liability on the part of an insurer with its insured tortfeasor. Id. at 10-11, 887 So.2d at 79.

The Sumrall opinion, although issued by an intermediate appellate court, accurately reflects the state of the law in Louisiana, as applied to the facts of this case, and is consistent with longstanding jurisprudence issued by other appellate courts as well as the Louisiana Supreme Court. See, e.g., Rollins v. Richardson, 2002-0556 (La. 12/4/02), 833 So.2d 921; Futch v. Fidelity & Casualty Company of New York, 246 LA. 688, 166 So.2d 274 (1964); Finnie v. LeBlanc, 2003-1013 (La.App 3 Cir. 3/10/04), 875 So.2d 71; Gasquet v. Commercial Union Insurance Company, 391 So.2d 466 (La.App. 4 Cir. 1980). While this Court is not Erie-bound to apply intermediate appellate decisions as the law of Louisiana, it is permitted to take guidance from those decisions deemed to be persuasive. As noted above, this Court finds that the Sumrall analysis and conclusions are persuasive as to the state of Louisiana law and provide a valid indicator of how the Louisiana Supreme Court would rule on the legal effect of the Partial Settlement here. As such, as using the standard set forth in Sumrall, the legal effect of the Partial Settlement here turns on the intentions of the parties to that contract.

Concerned that just such an analysis would be required, and recognizing the potential for confusion to result from the conditional language in Paragraph 2 of the Partial Settlement, this Court conducted two separate conferences in Chambers on March 19, 2003 – the day the Partial Settlement was confected – for the purpose of eliciting the intentions that prompted the ambiguous language contained in Paragraph 2 and the intended effect on Western American's status in this action. The descriptions provided by counsel for Morrow & Montemayor concerning the intentions of his clients were substantially identical in both conferences. Moreover, Ms. Morrow and Mr. Montemayor were present in Chambers during the second conference and expressed their agreement that their claims against Western American would remain live only to the extent necessary to permit them to proceed

-12-

against National Union.

*First chambers conference*:

The Court:       You release your reserved claims?
Mr. Rountree:  To the extent that it doesn't prejudice the liability of the insurers.
The Court:       Prejudice the liability of the insurer.  Okay.  Let me make certain. *You are giving up — you are also giving up your claim of defamation and sequestration and abuse of process to the extent that it does not prejudice the liability of WAT's insurer.*
Mr. Rountree:  Correct.

                                            * * *

The Court:       So even as to the reserved claims which is the defamation and the sequestration/abuse of process, *to the extent that Morrow & Montemayor may do so without prejudice to the liability of WAT's insurer and only to that extent, Morrow & Montemayor also are releasing WAT from the defamation and the sequestration/abuse of process claim.*
Mr. Rountree:  Correct.

                                            * * *

*Second chambers conference*:

Mr. Rountree (to Ms. Morrow):
                        If it would have the effect of releasing their insurance company, we are not releasing WAT.  That's another way of saying the same thing. . . . You have to be concerned any time you make a settlement that you don't destroy your insurance coverage and this says that *if we can release WAT without affecting the insurance, we're doing so.*
Mr. Morrow:    Oh, okay.
Mr. Rountree:  But if it would affect the insurance, we're not.
Ms. Morrow:   Okay.
The Court:       Okay.  And I can't comment to that or speak to that in any way.  That's between you and your lawyer and the language that you-all want to put in there, but that's what he is talking about is why this language is here, okay?
Ms. Morrow:   Okay.

                                            * * *

The Court:       Mr. Montemayor, do you have any questions you want to ask? . . . I want to make certain the two of you understand and are comfortable with this.
Mr. Montemayor: Yes, I am.[19]

---

[19]  Transcript of Proceedings of March 19, 2003 [Doc. 474], at 569-70, 595, 610.

The Partial Settlement, together with the quoted excerpts from the March 19, 2003 transcript, make clear that the settlement was intended to permit the complete exit of Western American from this litigation *except* to the extent that its presence might be necessary to permit Morrow & Montemayor to recover against National Union for the reserved claims. Despite the language of the CGL Policy, Louisiana law precludes any effect on Morrow & Montemayor's claims against National Union by the release of Western American in this case because of the clearly expressed intent to reserve two specific claims against National Union. Both the language of the Partial Settlement and the expressed intent of the parties clearly provide for the full dismissal of Morrow & Montemayor's claims against Western American. Counsel for Morrow & Montemayor has acknowledged as much to this Court.[20] Therefore, this Court finds that the release by Morrow & Montemayor of their claims against Western American would not affect the Reserved Claims against National Union in light of the express intent to reserve those claims. As Morrow & Montemayor have clearly stated their intent to release Western American if this were the legal effect of the dismissal, this Court finds that the Partial Settlement had the effect of releasing *all* of Morrow & Montemayor's claims against Western American while preserving the defamation and seizure-related claims against National Union, as Western American's insurer and as allowed by Louisiana's Direct Action statute as interpreted by Louisiana courts. With this ruling, all claims against Western American have been released by Morrow & Montemayor and this Court will recognize that fact

---

[20] "If a release caused a loss of coverage, there would be no release of Western American, and dismissal of the reserved claims would not be appropriate. If the court were to conclude that Western American's allegations of theft and conversion were known to be false, there would be no coverage under the policy . . . Defendants' claims against WAT for defamation would still be subject to a valid dismissal. The same is true for the sequestration/abuse of process claim. If there is no insurance coverage for this claim, it would still be released." Defendants' Memorandum Addressing the Effect of Settlement [Doc. 503].

formally in the order accompanying this ruling.

In addition to the release (and reservation) of claims, the Partial Settlement contains two stipulations identified as factual stipulations related to the Reserved Claims against National Union:

> [Western American] stipulates that all allegations of theft and conversion, including those in paragraph twelve (12) of the complaint, are not true [hereinafter referred to as the "falsity stipulation"]; [and]

> It is a stipulation that [Western American] did not make the allegations of theft and conversion in paragraph twelve (12) of the complaint knowing they were false; rather, these allegations were based on a misunderstanding of the legal effect of paragraphs eleven (11) and thirty-one (31) of the lease agreement, exhibit seventy-three (73), introduced into evidence at the trial of the contract claim and counterclaim [hereinafter referred to as the "knowledge stipulation"].[21]

The two stipulations, and their legal effects, will be discussed more particularly below.

Finally, the parties to the Settlement declared their intention that counsel who had represented Western American at trial would be removed from that representation and would not participate further in the litigation of this matter.[22]

## APPLICABLE LAW AND ANALYSIS

In its motion, National Union seeks summary judgment in its favor on all claims which have been reserved by Morrow & Montemayor and makes the following arguments in support of its motion:

> (a)    as to the defamation claim, to the extent that coverage ever existed, it has been vitiated by collusion between Western American and Morrow & Montemayor for the

---

[21] Partial Settlement, attached as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment on behalf of Intervenor, National Union Fire Insurance Company of Louisiana [Doc. 497], at 2, ¶¶ 3, 4.

[22] Id. at ¶ 7.

purpose of depriving National Union of an affirmative defense (*i.e.* the truth of Western American's allegations of theft and conversion); and

(b) as to the seizure-related claims, there is no coverage because the violations alleged by Morrow & Montemayor (I) do not constitute "accidents" under that portion of the policy and, therefore, are not covered by Coverage A *and* (ii) do not fall within the limited categories of coverage for intentional business acts provided by Coverage B under the policy.

Each of these arguments will be addressed separately below.

## I.    Summary Judgment Standards

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. Proc. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If

the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Proc. 56(e).

Of particular importance in this context is the allocation of the burden of proof. "If the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, then the movant can satisfy its summary judgment burden by submitting evidentiary documents that establish all of the elements of the claim or defense. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate." Resolution Trust Corp. v. Northpark Joint Venture, 958 F.2d 1313, 1322 (5th Cir. 1992), cert. denied sub. nom. Dannis v. Resolution Trust Corp., 506 U.S. 1048 (1993). The pending motion involves a request for dismissal pursuant to two affirmative defenses presented by an insurance company seeking to avoid a finding of coverage. Under the facts of this case, National Union bears the ultimate burden of proof at trial as to the two affirmative defenses upon which it relies here. Pursuant to Resolution Trust Corporation, it must submit evidence establishing all of the elements of its defense. Once that has been done, the burden will shift to Morrow & Montemayor to demonstrate that summary judgment is inappropriate.

## II.    Interpretation of Insurance Contracts in Louisiana

The parties are in agreement that Louisiana law applies to the insurance contract at issue. The Fifth Circuit has provided a succinct description of the general rules of interpretation which apply to Louisiana insurance contracts:

> Under Louisiana law, interpretation of an insurance policy is subject to the general rules of contract interpretation which requires juridical determination of the common intent of the parties to the contract. The intent of the parties, as reflected by the words in the policy, determine the extent of coverage. We construe the words of an insurance policy by applying their 'general, ordinary, plain, and proper meaning ... unless they have acquired a technical meaning.

> Exclusions to coverage contained in an insurance policy must be clearly and expressly set forth. When the language of an insurance policy is clear, it must be enforced as written. If, however, the terms of the policy are ambiguous, they must be construed against the drafter of the policy. Therefore, in the event the words contained in an exclusionary clause are susceptible to greater than one reasonable interpretation, we must adopt the interpretation that provides coverage to the insured.

Thermo Terratech v. GDC Enviro-Solutions, Inc., 265 F.3d 329, 334-35 (5th Cir. 2001) (internal quotations omitted).

## III. Applicable Tort Law

The first of the two seizure-related torts asserted by Morrow & Montemayor is that of wrongful sequestration, which focuses on the actions leading up to, and issuance of, the writ of sequestration by this Court. Because the writ was issued in Lafayette, Louisiana, the act of sequestration took place in the State of Louisiana and, therefore, Louisiana law will apply to this tort.[23]

Rule 64 of the Federal Code of Civil Procedure grants authority to federal judges to order the seizure of persons and/or property involved in federal litigation:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought . . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration . . . .

Fed. R. Civ. Proc. 64. In Louisiana, there are specific prerequisites which must be met prior to the issuance of a writ of sequestration:

---

[23] Morrow & Montemayor agree with this conclusion. "The writ was issued in Louisiana pursuant to La. C. C. P. arts. 3501 *et seq.* To the extent that it was wrongfully issued, Morrow and Montemayor have a claim for damages as provided by La. C.C.P. art. 3506." Morrow and Montemayor are Entitled to Damages for Wrongful Sequestration and Abuse of Process [Doc. 468], at 2.

A writ of attachment or of sequestration shall issue only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts shown by the petition verified by, or by the separate affidavit of, the petitioner, his counsel or agent.

The applicant shall furnish security as required by law for the payment of the damages the defendant may sustain when the writ is obtained wrongfully.

La. Code Civ. Proc. Art. 3501.

In Louisiana, a writ of sequestration "issues legally if the petitioner alleges adequate and valid grounds to support it, even if these are later disproved. . . . In the Louisiana cases holding that the writ of sequestration issued wrongfully, the plaintiffs failed to allege a necessary ground for issuance of the writ when they applied for it." Rocket Industries, Inc. v. Southern Tire & Supply, Inc., 706 F.2d 561, 563 (5th Cir. 1983). *See also* Hancock Bank v. Alexander, 256 LA. 643, 65-54, 237 So.2d 669, 672 (1970) (the issuance of a writ of sequestration "should not be availed of unless the conditions which permit them exist; that is to say, it is a prerequisite to their issuance that the proper grounds be alleged and sworn to."). Therefore, under the jurisprudence interpreting the Louisiana Code of Civil Procedure, sequestration is wrongful when a writ is issued without adequate supporting allegations made on behalf of the party moving for the writ.

The second tort reserved by Morrow & Montemayor is that of abuse of process. By contrast with the wrongful sequestration, abuse of process is directed at events which occur *following the issuance* of process. As the events of which Morrow & Montemayor complain with regard to the alleged abuse of process occurred in Texas, this Court assumes – as have the parties– that Texas law applies to those claims.

"It is critical that the process be improperly used *after* it has been issued. Texas law recognizes a cause of action for abuse of process where the original process, such as a writ, has been

abused to accomplish an end other than that which the writ was designed to accomplish. In other words, the original issuance of a legal process is justified, but the process itself is subsequently used for a purpose for which it was not intended." <u>Hunt v. Baldwin</u>, 68 S.W.3d 117, 130 (Tex.App.-Houston [14th Dist.] 2001) (emphasis in original). *See also* <u>Snyder v. Byrne</u>, 770 S.W.2d 65 , 67 (Tex.App. – Corpus Christi 1989) ("there must be an improper use of the process after its issuance"). In order to prove abuse of process, a plaintiff must demonstrate: "(1) that the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) that damage resulted to the plaintiff as a result of such illegal act." <u>Brown v. NationsBank Corp.</u>, 188 F.3d 579, 587 (5th Cir. 1999). Morrow & Montemayor allege that Western American convinced Deputy United States Marshal Nagle to seize documents and things that were outside of the scope of the writ, specifically including Morrow & Montemayor's business documents, which this Court had deliberately excluded from the scope of the writ.

## IV. Analysis

Before proceeding with an analysis of the arguments presented by National Union and by Morrow & Montemayor, it is important to note that, with regard to the coverage questions presented in the Motion for Summary Judgment, the facts are undisputed. The evidence demonstrating the facts supporting National Union's declaratory judgment action are either (a) already in the record, or (b) have been submitted by National Union in support of its motion. Moreover, Morrow & Montemayor have *not submitted any evidence* challenging the factual statements upon which National Union relies in support of its motion. Instead, Morrow & Montemayor rely solely upon argument made by counsel. Thus, as a preliminary matter, this Court notes that National Union has

sustained the first half of its burden of proof – that of demonstrating that there is no genuine issue of material fact as to the issues inherent in the relief sought – and the only challenge presented by Morrow & Montemayor is as to whether National Union is entitled to judgment as a matter of law.

Each of the Reserved Claims will be analyzed separately.

## A.     The Defamation Claim

With regard to the defamation claim, Morrow & Montemayor have alleged that the allegations contained in Western American's original Complaint (*i.e.* that Morrow & Montemayor engaged in theft and conversion) are defamatory in nature.  Morrow & Montemayor seek damages to compensate them for the injuries allegedly resulting from the inclusion of those statements in the Complaint, as well as the publication of those allegations to one or more of their customers, both orally and in writing.[24]

It is undisputed that, at all times prior to March 19, 2003, Western American maintained (to this Court, to the parties, and to its insurer, National Union) that its allegations of theft and conversion were factually true and correct.  Notwithstanding these repeated assertions, Western American stipulated, on March 19, 2003, that its allegations of theft and conversion were false. National Union alleges that this stipulation constitutes a violation of Western American's obligation to cooperate in National Union's defense in this suit and, on that basis, seeks dismissal of Morrow & Montemayor's defamation claim against it, together with a declaration that there is no coverage

---

[24] While Morrow & Montemayor have alleged in their counterclaims that Western American made defamatory statements to their customers directly (*i.e.* outside of the context of the lawsuit), no evidence of such publication was presented in response to the motion for summary judgment nor in the motion for reconsideration .  Therefore, the only evidence and facts before this Court in connection with this motion concern the allegedly defamatory statements made in the context of this lawsuit.  As a result, those are the only allegedly defamatory acts which will be considered in ruling on National Union's motion.

for the defamation claim.[25]

### 1. Applicable Policy Provisions

For purposes of this argument, the only pertinent policy provisions are those related to Western American's duty to cooperate in its own defense. Relevant portions of this policy read:

Duties in the Event of an **Occurrence, Claim or Suit**

c.      You and any other involved **Insured** must:

(3)      cooperate with us in the investigation or settlement of the claim or defense against the **suit.**[26]

### 2. Applicable Law Concerning the Duty to Cooperate

The duty to cooperate with one's insurer in connection with the investigation, settlement and/or defense of a lawsuit is one that has long been included as a standard in insurance contracts. *See, e.g.,* National Union Fire Insurance Company of Pittsburgh, Pa v. Cagle, 68 F.3d 905 (5th Cir. 1995); King v. King, 253 LA. 270, 217 So.2d 395 (1968); Bourgeois v. Great American Insurance Company, 222 So.2d 70 (La.App. 4 Cir. 1969); Freyou v. Marquette Casualty Company, 149 So. 2d 697 (La.App. 3 Cir.) *(en banc), writ denied,* 244 LA. 154, 150 So. 2d 771 (1963); Broussard v. Broussard, 84 So.2d 899 (La.App. 1 Cir. 1956).

---

[25] It is crucial to understand the argument that National Union is making and to distinguish it from those that are *not* before the Court. The argument is not directed at the substance or the merits of Morrow & Montemayor's defamation claim against Western American, nor is it directed at the question of whether there might, in the absence of fraud or collusion, have been coverage for Morrow & Montemayor's claims against Western American. To the contrary, National Union's argument assumes the possibility that a viable claim of defamation existed against its insured prior to the Partial Settlement and the possibility of a viable claim of coverage against National Union which survived the release of Morrow & Montemayor's claims against Western American. National Union specifically argues that the actions undertaken by Western American and Morrow & Montemayor *in confecting the falsity stipulation* – not in confecting the settlement itself – constitute fraud or collusion directed at harming National Union's interests.

[26] Exhibit 1 to Memorandum of Law in Support of Motion for Summary Judgment (Commercial General Liability Policy, § IV Commercial General Liability Conditions), at 8 of 13.

A clause of this character is a perfectly reasonable one, framed with the object of protecting the insurance company against the risk of collusion between the assured and persons claiming damages for alleged torts, and is a material condition of the policy, the violation of which by the assured forfeits his right to claim indemnity under the policy.[27]

The duty of cooperation does not, of course, require that an insured engage in, or support, a fraud, misrepresentation, or untruth in order to maintain its coverage,[28] but it *does* require that an insured refrain from acting in a way that will *materially prejudice* its insured's interests.

[T]here is a breach of a co-operation clause where the insured untruthfully or collusively assumes liability for the accident, or misrepresents the facts to the prejudice of the insurer . . . . it is generally held that it may be a breach of a co-operation clause where the insured, in fact to blame for an accident, gives the insurer an account thereof favorable to the defense, thereby misleading the insurer to its prejudice, especially where the insured, in the trial of the action against him, admits responsibility for the accident. [Moreover, a] modification or repudiation may constitute a breach if fraudulent or a result of a collusive attempt to help the injured person.[29]

* * *

The law is also well settled in Louisiana, that in order that there may be a breach of the condition requiring the insured to co-operate with the liability insurer, so as to avoid the latter's liability under the policy, the lack of co-operation, or the misrepresentation must be substantial and material to such an extent that it results in prejudice to the insurer in defending the case.[30]

---

[27] Broussard, 84 So.2d at 901-02.

[28] *See* Broussard, 84 So.2d at 902 ("The assured . . . is under no obligation to permit a sham defense to be set up in his name, nor can he be expected to verify an answer which he does not believe to be true."); Freyou, 149 So.2d at 702, ("the purpose of the cooperation clause is simply to require the insured to disclose all the facts within his knowledge and otherwise to aid the company to determine its liability under the policy"); and Bourgeois, 222 So.2d at 76 ("It was not a failure of cooperation constituting a breach of this condition merely because the factual testimony given by Gorney did not support the affirmative defense of his insurer. The policy condition requiring co-operation of the insured is not breached merely by the insured's denial of the position taken by the insurer if that position is not factually true.").

[29] Broussard, 84 So.2d at 903, *quoting* AMERICAN JURISPRUDENCE ON INSURANCE.

[30] Bourgeois, 222 So.2d at 75.

However, and as has been recognized by the Fifth Circuit, if an insurer seeks to deprive *a third party* to the insurance policy of the benefits of coverage, the mere proof of material prejudice is not enough. In order to avoid liability *to a third party* (that is, in order to constitute an affirmative defense on a direct action claim), an insurer must prove that the third party participated in fraud and/or collusion with its insured to the material prejudice of the insurer.

> [E]ven if a breach of the cooperation clause could be shown . . . this breach would not affect the [plaintiff's] rights, as a third-party claimant, to the proceeds of National Union's policy, *absent fraud or collusion.*[31]

Thus, while it is true that "the insured owes the insurer the duty of complying with the contract terms together with a general duty of performance in good faith," pursuant to Cagle, 68 F.3d at 912, National Union must prove that (a) the breach resulted from fraud or collusion between Western American and Morrow & Montemayor and (b) the breach was materially prejudicial in order to assert successfully *against Morrow & Montemayor* the defense of *Western American's failure to cooperate.*

### 3.    *Analysis*

The collusion question raised by National Union derives from the inclusion of the falsity and knowledge stipulations in the Partial Settlement. The only evidence as to the existence of fraud or collusion which has been presented is (a) the record of Western American's representations to this Court and (b) the Partial Settlement, which contains both factual stipulations. The question is whether the falsity and knowledge stipulations present sufficient evidence of a failure to cooperate, including fraud and/or collusion between Western American and Morrow & Montemayor, to sustain National Union's request for a ruling that, to the extent there might have otherwise been coverage

---

[31]    Cagle, 68 F.3d at 912 (emphasis added).

under the CGL policy on the defamation claim, it has been vitiated by Western American's failure to cooperate. This Court finds that, under the facts of this case, the answer is in the affirmative.

### i.     Failure to Cooperate.

This Court finds that there has been a demonstrated failure to cooperate with National Union by Western American, in at least two ways. First, Western American reached an agreement with Morrow & Montemayor that specifically included provisions of which National Union became aware prior to the Partial Settlement being executed and which National Union repeatedly instructed insured, Western American, not to include in its agreement with Morrow & Montemayor. This fact demonstrates a failure by Western American to cooperate with its insurer. Second, Western American stipulated to the existence of one of the four necessary elements of Morrow & Montemayor's defamation claim – that of the falsity of the original allegations – that had been in serious dispute at all relevant times prior thereto. By stipulating (over its insurer's strenuous objections) to facts that it previously had rigorously taken the opposite position, without any change in fact or circumstance beyond the partial settlement, and doing so, over its insurer's strenuous objection as the insurer was arguing the facts as previously asserted by its insurer, with full intention to prove those facts at trial, Western American clearly violated its duty to cooperate with its insurer.

### ii.     Material Prejudice.

In order to determine whether there was any material prejudice to the interests of National Union, this Court must first ascertain what did – and did not – change as a result of the Partial Settlement and the stipulation at issue. This process begins with evaluating the nature of the

allegedly defamatory statements at issue.[32]  In alleging "theft," Western American effectively accused Morrow & Montemayor of:

(a)  asserting control over funds or business activities (the factual component);

(b)  where the legal regime between the parties did not permit Morrow & Montemayor to do so (the legal component); and

(c)  having knowingly and willfully deprived Western American of that to which it rightfully was entitled (the intent component).

The allegations, therefore, reflected a dispute between the parties as to: the actions Morrow & Montemayor had taken during the course of the business relationship between the two parties, *the intent of the parties* as to that business relationship, and the legal effect of certain contractual provisions to which they had agreed.  In entering into the Partial Settlement, Western American changed its position, as to this dispute, and in particular the argued intent based upon a shift in its assertions made "of the legal effect of paragraphs eleven (11) and thirty-one (31) of the lease agreement."  Thus, with regard to the allegation of theft, Western American has not declared that it has changed its position with regard to the intentional and factual components of "theft," but only as to the **truth of** *their assertions* as to the *legal component* of theft.[33]

---

[32]  On April 25, 2002, this Court ruled that the conversion claim asserted by Western American was insufficient as a matter of law.  In order to keep the analysis as simple as possible (though fully acknowledging the complexity of the analysis as set forth in this extensive ruling), therefore, this Court will not consider the conversion allegation in ruling on the defense of failure to cooperate.

[33]  Morrow & Montemayor are correct when they argue that, under Louisiana law, an insured's acknowledgment of truthful facts cannot prejudice its insurer because the obligation to "cooperate" with an insurer does not require an agreement to misrepresent the facts.  However, here the facts did not change or shift, rather, Western America's *assertions* as to those facts have changed from vehement support of the truth of the assertions, to unequivocal denial of the truth of those assertions.  Had the Partial Settlement addressed the agreed to factual issues only, rather than their assertions and adoption or denial of those assertions, the outcome of this ruling might have been quite different.

The initial dispute between the parties as to the legal effects of their contracts and their actions as they related to their contracts was placed before this Court for resolution. Thereafter, the dispute expanded to include National Union as a result of the direct action claim asserted by Morrow & Montemayor (along with National Union's request for declaratory relief). Once the claim was presented to this Court for resolution, the only two ways to resolve the dispute was (a) a voluntary agreement reached as between the parties or (b) a ruling by this Court. The initial dispute between Western American and Morrow & Montemayor has been resolved amicably, but as between National Union and Morrow & Montemayor, the dispute remains.

The underlying claim of defamation is pivotal to the remaining dispute. Given the unique nature of a claim for defamation, "truth" is an affirmative defense which overwhelms the underlying claim. Thus, when Western American declared its assertions, which Morrow & Montemayor claim were defamatory, were not true – whether that is factually accurate or not – Western American attempted to concede the pivotal defense to Morrow & Montemayor's claims, and publically declared its position on this possible defense, heretofore available to Western American and its insurer National Union. Thus, Western American effectively removed the possibility of National Union being able to prove the affirmative defense with witnesses from Western American – thus, effectively removing the heretofore available affirmative defense. Because National Union has asserted, in response to Morrow & Montemayor's defamation claim, the affirmative defense of "truth" of the theft allegations, there can be no definitive declaration as to whether the allegation of theft was, or was not, true in the absence of a legal resolution of that claim (voluntary or otherwise). If no agreement had been reached, the parties were relegated to seeking a ruling from the Court. Until such a ruling has been made, the plaintiff's characterization of Morrow & Montemayor's

actions as "theft" are neither true nor false, accurate nor inaccurate. However, Morrow & Montemayor's _asserted belief_ as to whether Morrow & Montemayor's actions constituted theft _in light of Western American's interpretation of_ _and intent_ _as to the contract_) directly bear upon the interpretation of an ambiguous and disputed provision of the same contract.

The factual stipulations contained in the Partial Settlement, as noted by Morrow & Montemayor, do not purport to resolve the dispute between National Union and Morrow & Montemayor. They do, however, substantially impact National Union's ability to continue arguing and to prove the requisite intent of its insured as to the ambiguous and disputed portion of the contract and thus its ability to prove that the theft allegation was true in light of the intent of the parties. This fact stems, primarily, from the nature of contractual disputes generally. When two parties are in disagreement as to the legal effect of a contractual provision and that contract is ambiguous, the Court's role in resolving the dispute is directed toward ascertaining the intent of the parties to the contract. Western American's renunciation of its original allegations that theft had occurred under the contract due to Morrow & Montemayor's actions made pursuant to the contract was, in effect, a declaration as to its original intent as to the underlying contracts and that declaration of intent was different than the intent it had been asserting in this litigation for three years. Because National Union still asserted the affirmative defense of truth, as Western American had done, and because National Union could prove that defense only with the aid of Western American's evidence from Western American as to Western American's intentions when entering the contract, Western American's shift and declaration in the factual stipulations contained in the Partial Settlement effectively deprived National Union of its primary affirmative defense of truth, for all practical purposes.

-28-

Having ascertained the substantial legal and practical effect of the declaration made by Western American within the Partial Settlement on National Union's interests, this Court will now consider whether that effect constitutes "material prejudice." The parties have not favored this Court with the benefit of any research on the definition of material prejudice, and this Court's independent research concerning the concept of "material prejudice" suggests that it is one which is often used by the Louisiana courts, but one which has not been defined by those Courts. The only guidance this Court has been able to derive from the jurisprudence is several decades old.

> There is no showing that at that time the insurer was with regard to its liability *in a substantially different position than it would have been* if the initial statement procured from its insured by the adjuster had disclosed the same facts as those to which the insured testified at the discovery deposition. <u>Freyou</u>, 149 So.2d at 703 (emphasis added).

Similarly, the <u>Bourgeois</u> court found it persuasive that the insurer had suffered no change in its position in the litigation as a result of its insured's actions. "There appears to have been no defense against the negligence of [the insureds] and Great American makes no contention *that its position in that respect would have been any different. . . .*" 222 So.2d at 75. (emphasis added)

Under the guidance of either of these Louisiana cases, a shift in position as a result of the insured's actions is pivotal. Western American's declaration made within the stipulations clearly has materially shifted National Union's position in that Western American's actions have as a practical matter stripped National Union of its ability to prove the very same affirmative defense Western American previously had so vigorously pursued. This conclusion stems primarily from the *nature* of the shift in Western American's position and the unique interplay within a defamation claim between the actions taken and the truth inherent in those actions, as well as the interplay between the intent of the parties as to the contract and the actions taken by the parties pursuant to

-29-

that contract. Once Western American declared that, for whatever reason, the assertions it had made as to Morrow & Montemayor's actions were not _true_ – Western American robbed National Union of the affirmative defense, because Western American had in effect declared Morrow & Montemayor's actions were not in contradiction to the _intent_ of the parties as to the contract in dispute.

Because the two positions taken by Western American are diametrically opposed, it would have been a metaphysical impossibility for Western American to have held both simultaneously; either Western American originally intended the contract to work as it originally argued _or_ it originally intended the contract to work as it eventually stipulated, but it simply could not have done both at the same time and Western American's intent as to the contract, AT THE TIME THEY ENTERED INTO THE CONTRACT – is pivotal. As a party to the contract which is in dispute, their intent and understanding of the contract when entered into, and under which Western American accused Morrow & Montemayor of theft – is pivotal to any determination of whether Morrow & Montemayor's actions were in violation of the contract and thus could be found to be theft under that contractual interpretation. Western American's shift in position at this point in the procedural history, demonstrates a material prejudice to National Union's ability to afford itself of a heretofore viable – if not yet established – affirmative defense.

Morrow & Montemayor argues strenuously that no prejudice has accrued to National Union because the factual stipulation entered into by Western American was "accurate." This argument grossly understates the effect of the stipulation, when viewed within the practical and unique legal context discussed hereinabove. Moreover, this effect was not simply an unintended consequence of the settlement; it was the unavoidable and inescapable result and, thus, this Court can reasonably

infer, in part, the exact intent of the parties in entering into the stipulation.[34]

Despite arguing that National Union has endured no prejudice from the Partial Settlement, Morrow & Montemayor have acknowledged that the factual stipulations establish a "condition precedent" to Morrow & Montemayor's defamation claims against National Union – one that did not exist prior to Western American's stipulations. In declaring that the original theft allegation was false, Western American made clear that it was no longer willing to stand behind its contention and argued testimony and the evidence *that it had been in the process of presenting to this Court when the settlement was reached* and, inevitably, severely impacted National Union's ability to present those same witnesses's testimony and interpretation of that same evidence in support of an affirmative defense that Western American clearly and formally had in effect abandoned. Once Western American, as the party to the contract and which had made the allegations against Morrow & Montemayor under that contract, and upon whose interpretation of that contract and intent as to that contract the interpretation in part rested, went on record as agreeing that its own allegations were false when they were made – and at every moment since they were made, notwithstanding repeated assertions and stipulations to the contrary – the original intent of Western American and Morrow & Montemayor in entering into the underlying contracts was now defined, *to the detriment of National Union,* and the testimony as to understanding and intent became far less valuable (if not utterly

---

[34] It is the logic of the decision to include the factual stipulations that makes clear Western American's intent. The stipulations could not have been included for the purpose of affecting Morrow & Montemayor's claims against Western American because, as counsel repeatedly represented to this Court on and after March 19, 2003, the claims against Western American were being dismissed. The only other available explanation for the inclusion of the factual stipulations is an intent to affect Morrow & Montemayor's claims against National Union.

worthless) to National Union.[35]

For the foregoing reasons, this Court finds that the Partial Settlement materially prejudiced National Union's interests in violation of Western American's obligation, as an insured, to cooperate in National Union's defense against the defamation claim asserted by Morrow & Montemayor.

### iii.    Fraud.

This Court has ruled that Western American violated its duty to cooperate with its insurer, and that the violation materially prejudiced National Union's interests. However, as National Union seeks to extinguish the rights *of third parties* to the insurance contract, the question becomes whether this failure to cooperate resulted from fraud or collusion.[36]  Fraud is defined in Article 1953 of the Louisiana Civil Code: "Fraud is a *misrepresentation* or *a suppression of the truth* made with the intention either *to obtain an unjust advantage for one party* or to cause a *loss or inconvenience* to

---

[35] It would do well to note the unique nature of the defamation claim which, perhaps more than most non-criminal matters, encompasses intent and truth within its analysis, and the fact that the defamation claim arises out of contractual interpretation, which, also, encompasses intent of the parties. Truth is a defense to defamation; and what the parties might have intended within their contracts is pivotal to whether Morrow & Montemayor's actions under that contract could constitute theft and conversion, as alleged by Western American and complained of by Morrow & Montemayor. No facts had changed or shifted when Western American changed its characterization of their assertions as to Morrow & Montemayor's actions taken under the contract. Only Western American's declaration shifted – for whatever reason – however, that shift in declaration of understanding as to their intent under a contract – WHEN ENTERED INTO – is factually fatal.

[36] Cagle, 68 F.3d at 912. With regard to the question of collusion, the parties have assumed that the three definitions of collusion which appear in Footnote 6 in the Cagle decision – requiring the proof of either a secret agreement or an agreement that occurred *prior* to the institution of an action – are controlling here. A close review of Cagle, however, suggests that the Fifth Circuit's ruling is fact-specific and, thus, more limited than the parties have assumed; this conclusion is reinforced by longstanding Louisiana jurisprudence defining collusion much more broadly than the three definitions identified in Cagle. *See, e.g.,* In re Reed, 207 La. 1011, 22 So.2d 552 (1945); In re Steiner, 199 La. 500, 6 So.2d 641 (1942); Sere v. Darby, 118 La. 619, 43 So. 255 (1907); Babb v. Boney, 30,443 (La.App. 2 Cir. 4/8/98), 710 So.2d 1132. In light of the conclusions reached concerning fraud, however, it is unnecessary for this Court to determine which definition of collusion would apply in this case.

the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953. (emphasis added).

National Union has the burden of proof on its affirmative defense of failure to cooperate, however, it has produced neither evidence nor argument concerning fraud. As a result, this Court will address Morrow & Montemayor's argument (for purposes of this analysis, only) that: (a) the initial allegations were false; (b) both the falsity stipulation and the knowledge stipulation, however, are true; and (c) the shift does not represent fraud on the part of Western American notwithstanding the radical shift reflected in these completely contradictory statements about facts concerning which Western American is the only party with any knowledge.

Morrow & Montemayor's position is an extremely difficult one to sustain, even for present purposes, as Western American's shift declares a change *in the original intent* with which it entered into contracts with Morrow & Montemayor. Otherwise the declaration would have no import. At issue is the interpretation of the contract entered into between Western American and Morrow & Montemayor. Inherent in that interpretation (as the parties argue an ambiguity exists) is the intent of the parties *at the point when they entered into the contract.* Western American's intent in entering into the contract cannot change after the contract has been confected and is in effect without a change having been made to the contract – a fact not argued here. Western American knew what its intent had been when it entered into the contract with Morrow & Montemayor and thus, knew whether Morrow & Montemayor's actions were operating against that intent and, in effect, taking monies Western American believed to be its own. That intent as to the contract defined its belief as to Morrow & Montemayor's actions and later characterization of Morrow & Montemayor's actions as theft. The *intent when entering the contract* cannot change some three years after suit has been filed

alleging breach of that contract and that theft occurred pursuant to the contractual relationship created by that contract. This fact – *i.e.* Western American's intent – is the fact that was and is known and which cannot innocently shift after the fact, and this fact is inherent within how one characterizes Morrow & Montemayor's actions taken under the contracts and whether, *as a matter of law*, theft can be found. Either *Western American believed* Morrow & Montemayor violated the contract and took monies owed to Western American based upon Western American's intent when entering the contract *or Western American did not.* That is the pivotal underlying fact as to the issue at hand, which flows to intent of the parties to the contract, which flows to the determination and characterizations of Morrow & Montemayor's actions under that contract, which flows to Western American's declarations of theft and conversion and Morrow & Montemayor's claims of defamation resulting from those declarations and which flows to whether, under the contract, those claims could be true. Thus, when Western American belatedly declared *its changed belief* as to Morrow & Montemayor's actions, it inescapably declared its belief as to Western American's intent when entering the contract and its meaning. It is that pivotal, underlying fact to which the stipulations were addressed – it is that underlying fact Western American has now irrevocably shifted.

As with the earlier analysis of the effect of the stipulations, the fact that the two positions taken by Western American as to their underlying understanding of the contract based upon their underlying intent when entering the contract are incompatible creates only a very limited number of explanations when analyzing the possibility of fraud.

The allegation of theft arises out of Western American's intent as to the contract between Western American and Morrow & Montemayor, which is pivotal to the interpretation of the contract. Whether Morrow & Montemayor's past actions, made in conjunction with the then existing contract,

exceeded Morrow & Montemayor's rights under that contract, as Western American intended and understood them to be, to the extent Western American believed theft occurred, keys to the interpretation of that contract.

Consequently, at the relevant point in time to this inquiry, *i.e., the time at which the alleged defamatory allegations were made*, Western American knew its intent when it entered into contract. That *intention*, when entering into the contract, cannot change some three years into litigation arising out of that contract.

Certainly Western American's *understanding* of the legal import of the contract, and of Western American's and Morrow & Montemayor's rights and obligations under the contract can change with a greater understanding of the applicable law; however, Western American's intention cannot change. Therefore, to the extent Western American's intent impacts interpretation of ambiguous provisions of the contract, it also impacts the determination of the rights and obligations of Western American and Morrow & Montemayor under that contract.

Had Western American felt it relevant and necessary to admit its now greater understanding of the law surrounding the issue, they clearly could and perhaps should have done so. However, Western American went beyond that admission and stipulated to *falsity* of its earlier claims – not error on its part.

Therefore, accepting Morrow & Montemayor's argument that the original allegations were false (and Western American's current position is true), it must be true that Western American made its original allegations either with, or without, knowledge that they were false. Logically, either (a) there was fraud because Western American initially knowingly made false allegations and then hid that fact from National Union until *after* National Union had provided a defense on the defamation

claim (in which case National Union is correct, coverage has been vitiated due to a violation of Western American's duty to cooperate) *or* (b) there can be no fraud because there was no knowledge on the part of Western American that its original allegations were false and, therefore, there can have been no defamation of Morrow & Montemayor *as malice is a required element of defamation* (in which case, Morrow & Montemayor's claims fall as a matter of law). Both possibilities are considered and addressed below.

> **a.** **If Western American had knowledge that it made false allegations in its Complaint, then it has committed fraud such that coverage has been vitiated.**

The first of the two possibilities available to explain Western American's shift in position is that it knowingly made false statements in its Complaint against Morrow & Montemayor, and that the falsity stipulation represents an abandonment of those false allegations. As defined in the Civil Code, fraud requires (I) a misrepresentation or suppression of the truth (ii) for the purpose of causing a loss or inconvenience to another party. The record would clearly support the existence of both of those elements here.

As to the alleged misrepresentation by Western American, it is important to focus on which alleged untruth is at issue. Morrow and Montemayor allege that Western American's allegations in the Complaint were untrue and Western American has stipulated to the fact, and this Court has accepted that allegation as true for purposes of this analysis only, while recognizing the actual inherent legal determination is one which can only be made by a trier of fact within a court of law or by an admission of the parties. That legal determination also, must turn upon *whether the contract allowed Morrow & Montemayor's actions*, and thus, *the intent of Western American* and Morrow & Montemayor under that contract. If the parties did not intend for Morrow & Montemayor to take

-36-

the money complained of, then arguably theft and conversion could have occurred. If the parties, and thus the contract, did intend for Morrow & Montemayor to take the money complained of, then theft and conversion, by law, arguably could not have occurred.

A party's inclusion of false allegations in a Complaint does not necessarily represent a violation of its duty to cooperate with its insurer – thus, Western American's mere knowing inclusion of allegations in the Complaint which prove to be false would not necessarily entitle National Union to relief; however, the representations at issue are not merely those contained within the Complaint, but also, were those that Western American made to its insurer. During the course of this litigation, Western American made repeated representations to its insurer, to this Court, to Morrow and Montemayor, and to the public by way of the public record that they believed those allegations to be true, *i.e.*, that under its contract with Morrow & Montemayor, it was their intent when they entered into the contract that Morrow & Montemayor was not due money of the type taken; therefore, that they believed Morrow & Montemayor took money owed to Western American and therefore, that Morrow & Montemayor had committed theft. These misrepresentations create the existing tension when Western American now asserts the conclusion flowing from those allegations have been false. Although the *legal conclusion* is not subject to stipulation, *inherent in that legal conclusion is Western American's belief, Morrow & Montemayor did or did not take money owed to Western American under the relevant contract based upon their intent when they entered into the contract with Morrow & Montemayor.* If their intent was for Morrow & Montemayor not to be entitled to the money pursuant to the contract and their belief, thus, was that under the contract they had entered into with Morrow & Montemayor, Morrow & Montemayor was not so entitled – allegations of theft and conversion could have been truthfully made; if that was not

the belief, those allegations could not have been truthfully made. This shift by Western American, *stemming from their intent* at the time they entered into and formalized the contract would be the foundation for evaluating the rights and obligations of the parties made pursuant to the contract, and thus pivotal to the argument that the shift constituted fraud as contemplated by the jurisprudence, when interpreting the insured's obligation to cooperate.

National Union was entitled to rely upon representations made by its insured in making its determination as to whether or not a defense was owed by National Union to Western American under the CGL policy for the defamation claim - just as this Court was entitled to rely upon those representations in evaluating whether a true dispute existed as between the parties, as to whether theft or conversion had occurred. Western American's allegations of theft properly played an important role when National Union was making its determination whether or not a defense was owed to Western American on the defamation claim under the terms of the policy. Western American's belief and intention that its contract with Morrow & Montemayor did or did not allow for Morrow & Montemayor to take the funds complained of would have been pivotal to that determination. Defense was provided to Western American for the defamation claim by National Union – at a cost of many thousands of dollars – and thereafter, Western American acknowledged that the allegedly defamatory allegations had been false from their inception; this admission would have reasonably impacted National Union's decision to provide a defense to Western American for that claim. Further, inherent in that declaration is the inescapable declaration that Western American's intent under the contract was such that Morrow & Montemayor's actions could not constitute theft or conversion, *i.e.* that Morrow & Montemayor had legal claim by way of the contract to the money taken.

Under the facts of this case, the definition of fraud contained in the Louisiana Civil Code would compel a finding that Western American, if it knowingly published allegations it knew were based upon false assertions in its Complaint and knowingly represented to its insurer that those allegations were truthful, had engaged in fraud such that coverage on the defamation claim would be vitiated due to Western American's violation of its duty to cooperate with its insurer, National Union. Western Union had a duty to National Union to provide the truth, the facts, and the circumstances pertinent to the defamation claim, *i.e.* their intent as to the contract and their understanding as to whether the contract allowed Morrow & Montemayor to take the funds in dispute. If it did, Morrow & Montemayor could not be guilty of theft or conversion; if it did not, Morrow & Montemayor might, as a matter of law, be found guilty of theft and conversion in a court of law. At all times pertinent, Western American had to have known its intent and thus its belief as to this question. Were this Court to find shifts in the known intention and understanding of the contract to have been intentional, this Court would be compelled to find fraud as contemplated by the jurisprudence. [37]

> **b.** **If Western American included false allegations in its Complaint without knowledge that they were false but with either negligence or reckless disregard for the truth, then the elements of defamation are not met here.**

The second possibility is that Western American's abrupt shift concerning the nature of Morrow & Montemayor's actions reflects a legitimate evolution in Western American's

---

[37] This Court notes that no evidence has been presented in this case to suggest that Western American knowingly made false allegations in its Complaint, nor has any party so argued, nor does this Court find that it did so. The possibility has been analyzed solely for the purpose of establishing that, under no available factual alternative would Morrow & Montemayor be able to recover against National Union on their defamation claims.

understanding of the truth (*i.e.* that the initial allegations in the Complaint were believed to be true when they were made, but that they are now known to be incorrect), an argument this Court would hope to be correct, given the involvement of counsel. Under this assumption, the allegations were made either (a) with reckless disregard for the truth, (b) negligently (and, therefore, wrongfully), or (c) based upon a legitimate evolving understanding of the law and/or the facts. Morrow & Montemayor's most recent arguments are directed toward supporting this assumption. For instance, they argue that Western American's allegations were based upon "statements in the equipment lease" which led it to "naively believe that it had the right to possess" money earned by the trucks operating out of Morrow & Montemayor's office. However, if the Court accepts the interpretation that the alleged false statements contained within the Complaint were based upon language in the equipment lease which reasonably led Western American to believe that its allegations were true, then Morrow & Montemayor's defamation claim must fall *as a matter of law.*

Under Louisiana law, there are four elements which must be proven by a party seeking to recover on a cause of action for defamation, one of which is "fault," which the Louisiana Supreme Court defines as "malice, actual or implied."[38] "Malice (or fault), for purposes of the tort of defamation, is a lack of reasonable belief in the truth of the statement giving rise to the defamation. . . ."[39] As to the existence of malice, the parties have invoked two competing exceptions to the normal rules which apply to determining whether malice has been proved. The applicability of both is determined as a matter of law.

The first is the "defamatory per se" doctrine, which holds that words which tend to "injure

---

[38] Costello v. Hardy, 2003-1146 (La. 1/21/04), 864 So.2d 129, 139.

[39] Id. at 143.

one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se."[40]  When a plaintiff proves "publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant."[41]  Morrow & Montemayor argue that an allegation of theft constitutes defamation per se and entitles them to a presumption of malice on the part of Western American. Assuming this argument to be correct, however, the analysis does not end at that point.  National Union has an opportunity to rebut the presumption and has invoked his own responsive defamation doctrine.  Specifically, National Union has invoked the special rules that apply to statements made in the context of a lawsuit.  When the alleged defamation consists of allegations made in the context of a lawsuit, the Louisiana Supreme Court has found that the existence of a colorable claim precludes a finding of malice.[42]

The term "colorable claim" is one which is often used but rarely defined in the jurisprudence. While this Court has not located a plain definition of the term "colorable claim" by the Fifth Circuit, it has, nonetheless, located several attempts by that Court, in various contexts, to shed light on the meaning of the phrase.  The Court has determined that a colorable claim (often described as one which is "non-frivolous") is one which "present[s] an arguably sound claim-and-can the complainant prove a set of facts realistically warranting the relief sought,"[43] one which "is arguably supported by

---

[40] Id. at 140.

[41] Id.

[42] Id. at 144-45, *quoting* Eusant v. Unity Industrial Life Ins. & Sick Benefit Ass'n of New Orleans, 195 La. 347, 353, 196 So. 554, 556 (1940).

[43] Foulds v. Corley, 833 F.2d 52, 54 (5th Cir. 1987).

case or statutory law,"[44] and/or one which is "not so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit" that it cannot even support a claim of jurisdiction.[45]

In this particular case, Western American made the following specific allegations in its Complaint:

5.     Pursuant to this Terminal Agreement entered into between the parties . . . defendants were to represent the company on an exclusive basis as described in the agreement.[46]

7.     Western American has recently discovered by mistake that defendants, Morrow & Montemayor d/b/a Houston Trucklines and d/b/a Western Intermodal Container Services, have been booking transportation loads through the terminal at issue and billing the customers directly under the name Western Intermodal Container Service, thereby diverting all or part of the accounts receivable owned by Western American to its own use and benefit.[47]

12.     Western American further alleges that defendants are liable pursuant to La. Civil Code Article 2315 for conversion and theft of the accounts receivable and funds of the plaintiff and the resulting loss and damage occasioned thereby.[48]

While not artfully made, the allegations suggest that (1) Morrow & Montemayor had an agreement with Western American for exclusive representation; (2) business conducted pursuant to that agreement belonged to Western American; (3) Morrow and Montemayor had been collecting funds properly belonging to Western American through the use of a business known as "Western Intermodal Container Services;" and (4) Morrow and Montemayor had not been transferring those

---

[44]  Hennigan v. Ouachita Parish School Board, 749 F.3d 1148, 1152 (5th Cir. 1985).

[45]  Rollins Environmental Services (FS) v. Parish of St. James, 775 F.2d 627, 631 (5th Cir. 1985).

[46]  Complaint [Doc. 1] at 3, ¶ 5.

[47]  Id. at 3, ¶ 7.

[48]  Id. at 4, ¶ 12.

funds to Western American. It is no stretch to state that a party which believes that its obligee has been "diverting all or part of accounts receivable" – were those facts proved to be true – arguably would be justified in asserting that its obligee was guilty of theft and conversion.[49] Therefore, the allegations made by Western American asserted a claim "not so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit;" their allegations rise to the level of a colorable claim for theft or conversion.[50] Morrow & Montemayor's argument that Western American's allegations were based upon an interpretation of actual language within the contract – no matter how "naive," "foolish," and/or "misguided" – supports (albeit unintentionally) this conclusion.

This Court finds that if Western American believed, at the time the allegations were made, that Morrow & Montemayor should not have taken the money per the parties intent under the contract, then Western American could have asserted a colorable claim against Morrow & Montemayor for theft and conversion. This is the effect of the stipulation by Western American declaring a belief – albeit "naive," "foolish," and/or "misguided" – that Morrow & Montemayor

---

[49] Such an allegations could be justified under either Louisiana or Texas law. Under Louisiana law, "an act in derogation of [another's] possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." Tubos de Acero de Mexico, S.A. v. American International Investment Corp., Inc., 292 F.3d 471, 479 (5th Cir. 2002). Theft is defined as "the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential." La. Rev. Stat. 14:67. In Texas, conversion consists of "an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." Carson v. Dynegy, Inc., 344 F.3d 446, 456 (5th Cir. 2003). Theft is defined as the unlawful (*i.e.* without the owner's lawful consent) appropriation of property with the intent to deprive the owner of that property. V.T.C.A., Penal Code §31.03.

[50] Rollins Environmental Services (FS), 775 F.2d at 631.

could not do, pursuant to the contract, what it had done. Western American has, in effect, declared a "naive," "misguided," or "foolish" belief as to the contract which spawned their claims of theft and conversion against Morrow & Montemayor. Given the less than clear language of the disputed contract, this Court finds, therefore, that Western American did assert a colorable claim.

Under Louisiana law, malice is a necessary prong in a defamation claim; there can be no malice associated with allegations contained in a Complaint where the allegations state a colorable claim, here for theft. *See* Costello, 864 So.2d at 144-45. Therefore, under the facts of this case and in light of the stipulations made by the parties and of this Court's findings, Morrow & Montemayor cannot prove that malice (actual or implied) existed on the part of Western American when the allegedly false allegations were made. For these reasons, under the assumption that Western American did not intentionally and knowingly include allegations based upon false assertions in its Complaint, but made these allegations "naively; misguidedly" or "foolishly" or simply wrongly, Louisiana law compels the conclusion that no defamation occurred when those allegations were included in the Complaint.

### c. Concerning the Fraud Element.

With regard to the question of fraud, National Union has presented evidence from which it is possible to *infer* that Western American engaged in fraud – either by making and supporting its original allegations, or by entering the falsity stipulation – but it has not *proven* that fraud actually occurred. Thus, the motion for summary judgment does not support a ruling in favor of National Union based upon a *finding* of fraud. On the other hand, Morrow & Montemayor, in their effort to disprove the existence of fraud, have unintentionally demonstrated that the elements of defamation can not be met – malice is lacking. Taken together, the briefing has prompted this Court to reach

the conclusion that, without regard to which characterization of Western American's actions is accurate, the outcome remains the same: there is no coverage for Morrow & Montemayor's defamation claims under the National Union policy and, for the reasons explained fully above, this Court so finds. Either Western American intended to be untruthful and thus, fraud would exist which would vitiate coverage, or Western American did not intend to be untruthful and thus, a colorable claim was made, in which case malice is lacking and the defamation claim must fail. Either way, coverage for Morrow & Montemayor's claim for defamation under the statute fails.

### 4. *Conclusion*

For the foregoing reasons, this Court finds that National Union has carried its burden of proof and shown no genuine issue of material fact exits as to its defense that there is no coverage as to the defamation claim, and that it is entitled to judgment as a matter of law because:

- Western American had a duty to cooperate with National Union in responding to the defamation claims of Morrow & Montemayor;

- Western American clearly violated that duty to cooperate by entering into stipulations designed to assist Morrow & Montemayor in establishing one element of their claim against National Union;

- Western American's violation of its duty to cooperate with National Union caused material prejudice to National Union in this case; and

- either Western American committed fraud in violating its duty to cooperate *or* Western American's original allegations were not made with malice and, thus, cannot constitute defamation as defined by Louisiana law and defense has already been provided.

In response to National Union's motion, Morrow & Montemayor have not identified any basis from which this Court could conclude that issuing summary judgment in favor of National Union is not proper. National Union's motion for summary judgment on the defamation claim, therefore, will

be GRANTED.

## B.    The Seizure-Related Claims

In addition to their defamation claim against National Union, Morrow & Montemayor reserved, in the Partial Settlement, a claim they identified as "sequestration/abuse of process," but which is better analyzed, in accordance with the applicable law, as two separate claims arising out of (1) the issuance of the writ of sequestration and (2) the execution of that writ. These claims will be referred to collectively as the "seizure-related claims." National Union moves for summary judgment alleging there is no coverage on these claims on the ground that they are not covered under either Coverage A or Coverage B of the CGL Policy issued to Western American.

### *1.    Morrow & Montemayor's Allegations and Claims*

As was clear above, the first step in any analysis of whether or not coverage exists for a given claim is to identify the claim that has been asserted, as well as the factual allegations supporting the claim that is being made. In this instance, Morrow & Montemayor, as plaintiffs, have not cooperated in the crucial first step. There has not been a consistent recitation of Morrow & Montemayor's claims made and theories espoused as to Western American's liability in this Court, notwithstanding multiple orders and attempts by this Court and defendants to obtain clarification.

The initial statement of Morrow & Montemayor's claims is found in their Counterclaim against Western American. In that document, they alleged the issuance, execution, and dissolution of the writ of sequestration,[51] and identified their specific complaints about the actions Western American took through its counsel.[52] Having made their factual allegations, Morrow & Montemayor

---

[51]    Answer and Counterclaim [Doc. 13], at 5-6.

[52]    Id.

-46-

specifically identified the claim they were making against Western American:

> Because Western American Transportation, L.L.C. asserted no claim or presented any evidence of ownership in the seized SSRS forms, unused fuel decals, log books, driver logs completed to date, license plates purchased in the name of Western American, rental equipment, accounts payable to Johnny Montemayor and Robbie Morrow, the business records of Johnny Montemayor and Robbie Morrow, and the bank accounts of Houston Trucklines and Western Intermodal Container Services, Western American Transportation, L.L.C's actions *constitute a wrongful seizure.*[53]

Five months later, Morrow & Montemayor's seizure-related claims had informally, without amendment to its pleadings, expanded to include allegations that the writ of sequestration was improperly issued due to Western American's misrepresentations to this Court and this Court's failure to require that Western American post a security bond as required by the Louisiana Code of Civil Procedure:

> In November or December of 1999, plaintiff presented [documents stolen from defendants' office] to the court along with the misrepresentation that the stolen papers revealed "conversion and theft of the accounts receivable and funds of the plaintiff...." (Complaint, ¶ 12).... Based upon misrepresentations and omissions, plaintiff obtained a writ of sequestration and made it effective in Texas.... Despite the rather limited list of items plaintiff was authorized to seize, Konrad Jackson convinced the marshal and the judge or magistrate in Texas who domesticated the writ that he had the right to take anything he wanted from the defendants' offices. He proceeded to do just that....
>
> The seizure of defendants' business records exceeded the scope of the writ of sequestration, and the writ of sequestration exceeded the scope of its permissible use. Plaintiff was required to allege ownership or a security interest in items seized. No such allegations were made, and the bond required by law was not posted. The writ was used as nothing more than a license ro ransack defendants' offices and seize defendants' material indiscriminately.
>
> Plaintiff's . . . gross misconduct consisting of wrongful seizure and misrepresentations have resulted in a devastating economic injury to defendants.[54]

---

[53] Id. at 6 (emphasis added).

[54] Joint Status Report [Doc. 21], at 6-7.

Thus, after several months of discovery, Morrow & Montemayor's description of their claims, without amendment of their pleadings, included: (a) *wrongful issuance of the writ of sequestration* because (I) it [the writ] was based upon misrepresentations and (ii) no security bond was posted despite the legal requirement for one, and (b) *wrongful seizure* by the United States Marshal and Western American because (I) Mr. Jackson misled Judge Harmon to elicit an expansive ruling from her concerning the scope of the writ of sequestration; (ii) too many things were seized, (iii) Morrow & Montemayor were not permitted to inventory and documents and things seized, and (iv) Western American did not return all documents that they seized.

Almost two years later, Morrow & Montemayor, also, asserted a counterclaim against National Union after it intervened into this action. Seeking merely to assert a direct action against National Union, as the insurer of Western American, Morrow & Montemayor did not include specific allegations in their Counterclaim, but merely made reference to *a memorandum* that previously had been filed on their behalf. "As more fully explained in their opposition to National Union's motion for summary judgment, and in accordance with the Louisiana Direct Action Statute, National Union is responsible under its policy of insurance for the damages which were sustained by counterclaimants."[55]

Granting Morrow & Montemayor the benefit of the doubt, for these limited purposes only, that claims asserted in such an unspecific, ambiguous way, could properly be before this Court, this Court reviewed the contents of Morrow & Montemayor's opposition to National Union's motion for summary judgment and found only one description of their seizure-related claims:

---

[55] Answer to Intervenor's Complaint and counterclaim Against National Union Fire Insurance Company [Doc. 301], at 3.

-48-

> Not only was the writ wrongly sought and obtained, it was largely ignored, at least the limitations to the scope of property subject to the writ. . . . Under Jackson's direction, Western American ransacked defendants' office and indiscriminately seized property of defendants.[56]

Thus, the claims that were pled in the Counterclaim against National Union allege in some fashion that (a) the writ was wrongly sought and obtained and (b) the seizure included documents and/or things beyond the scope of the writ that was issued. No mention was made of the theories of liability associated with the alleged refusal to permit Morrow & Montemayor to inventory the documents and things removed from their office, nor that documents were not returned to Morrow & Montemayor once the writ was dissolved.

By the time of final trial preparations, Morrow & Montemayor depicted their claim against Western American within the pre-trial order as one claiming "Sequestration/Abuse of Process" as discussed hereinabove and identified their seizure-related claims as follows:

> Western American applied for and obtained an *ex parte* writ of sequestration without furnishing a bond. It originally applied for a writ of attachment and a temporary restraining order as well. The court declined to sign the originally submitted sequestration order which included a directive to seize Morrow and Montemayor's business records, but signed a revised order omitting the line item relating to Morrow and Montemayor's business records.

> Western American had no claim of ownership or lien against many of the items described in the writ of sequestration, and it ignored the limitation preventing the seizure of Morrow and Montemayor's business records.[57]

This description of Morrow and Montemayor's allegation is fairly consistent with the allegations that came before it, seemingly describing claims for: (a) the wrongful issuance of a writ of sequestration

---

[56] Memorandum in Opposition to Motion for Summary Judgment filed by Nation Union Fire Insurance Company of Pittsburgh, Pennsylvania [Doc. 298], at 9-10.

[57] Pre-Trial Order [Doc. 450], at 4.

arguing no bond was posted by Western American and the writ, as issued, applied to many items to which Western American had no claim of ownership or lien; and (b) Western American exceeded the scope of the writ when it arranged for the seizure of the business records which this Court had specifically excluded from the scope of the writ. Again, no mention is made by the earlier complaints as to inventories and the alleged failure to return documents or things after the writ of sequestration was dissolved.

In the Partial Settlement, Morrow & Montemayor described only one seizure-related claim as having been made against National Union, that of "sequestration/abuse of process." Shortly thereafter, this Court requested post-trial briefing concerning whether there was a legal basis for Morrow & Montemayor's seizure-related claims against National Union. In that brief, Morrow & Montemayor describe their wrongful sequestration claim as being based upon: (I) the alleged failure of Western American to properly allege the basis for its writ of sequestration[58] and (ii) the alleged misrepresentations made by Western American concerning the conduct of Morrow & Montemayor in order to convince this Court to issue the writ. The claims arising out of the execution of the writ of sequestration were identified as arising out of (I) the fact that Western American seized the business records of Morrow & Montemayor after having been denied the right to do so; and (ii) the allegation that Western American "concealed from whomever gave it *carte blanche* authorization in Texas the fact that it had been denied the right to seize defendants' business records."[59]

---

[58] "Except to the extent that an inference may be drawn from the allegations of theft and conversion in ¶12, there is no allegation of either of the grounds for sequestration: ownership or lien." Morrow and Montemayor are Entitled to Damages for Wrongful Sequestration and Abuse of Process [Doc. 468], at 3.

[59] Id. at 5.

Up to that point in the litigation – approximately one month *after* the trial was suspended due to the settlement agreement between the plaintiff and defendants – the development and presentation of Morrow & Montemayor's claims had been fairly consistent. The original counterclaim presented a bare-bones recitation of the facts and theories known at that point; the Joint Status Report included theories, both known and suspected; the descriptions provided once discovery had been substantially completed identified those theories that were supported by law and evidence – the theories, albeit loosely and fluidly stated, under which all parties were proceeding toward trial.

In their most recent post-settlement briefing, however, Morrow & Montemayor's claims have changed substantially, not only in tone but in substance. When describing the facts and claims associated with the issuance of the writ, Morrow & Montemayor now argue that "it is doubtful that the writ would have issued if Western American had confined itself to factual allegations,"[60] and describe Konrad Jackson's communications with this Court as "negligent misrepresentations."[61] Similarly, the seizure of documents is no longer described as an abuse of process, but merely an "improper execution of the writ orchestrated by Konrad Jackson."[62] The vim, vigor and characterization of earlier briefs and arguments to this Court has given way to a restraint and consideration that has been utterly absent from these proceedings up to this point.

> The conduct of Western American was wrongful and misguided, but there is no evidence that it intended to inflict bodily injury on Morrow & Montemayor. Western American focused on *statements in the equipment lease that purport to make it the owner of funds* derived from the use of the leased equipment. It maintained that it

---

[60] Memorandum in Opposition to National Union's third Motion for Summary Judgment [Doc. 504], at 10

[61] Id. at 14.

[62] Id. at 10.

owned the money earned by the trucks and the paperwork generated in connection with the truck's activities. Western American *naively believed* that it had the right to possess the records generated by Morrow and Montemayor in the operation of their separate business, Western Intermodal Container Services. The conduct was *foolish and culpable*, but the record is devoid of evidence that Western American expected or intended to cause Robbie Morrow's mental and physical collapse.[63]

Aside from the new, lessened tone, Morrow & Montemayor now, also, seek to expand their claims to include one for wrongful entry – *a claim heretofore not pled or referenced in any fashion.*

The negligent misrepresentations made to the court concerning theft and conversion corrupted the propriety of entry pursuant to the writ of sequestration. Ordinarily, entry pursuant to the writ of sequestration would not be wrongful. . . . Not only was the writ wrongfully sought and obtained, it was largely ignored, at least the limitations to the scope of property subject to the writ. Any doubt as to the proper application of the wrongful entry coverage should be resolved by Jackson's disregard of the scope of the writ. Under Jackson's direction, Western American ransacked defendants' office and indiscriminately seized property of defendants. This conduct amounted **to wrongful entry** and the invasion of the right of occupancy of the premises.[64]

The fact that this new claim and adjusted characterization is made only after and in direct response to the partial settlement, and foreshadows the policy provisions identified in Coverage B – discussed with more particularity below – is not lost on this Court. The theory now espoused presents an entirely new theory of liability that previously has not been identified by Morrow & Montemayor in any fashion, in any manner, at any relevant or procedural juncture, despite repeated orders by this Court for Morrow & Montemayor to identify, with particularity, their claims.

Morrow & Montemayor's expansion of their claims comes far too late in the course of this litigation to be permitted over the objection made. This Court has documented, *infra*, six (6) occasions on which Morrow & Montemayor were ordered to or voluntarily described their claims

---

[63] Id.

[64] Id. at 14 (emphasis added).

and allegations against National Union and/or its insured, Western American. On *none* of those occasions did they include any reference to a claim for wrongful entry. They will not be permitted now over objection to expand the scope of their claims, particularly in the procedural form of *argument* contained within a Memorandum in Opposition to a Motion for Summary Judgment, a motion which is substantially identical to *two* prior motions by the mover, National Union.

Again, it is not lost on this Court that a very significant shift as to the relative positions of the parties occurred prior to the latest briefing by Morrow & Montemayor. Morrow & Montemayor entered into the Partial Settlement with Western American, and in that Partial Settlement Morrow & Montemayor specifically dismissed all claims against Western American other than one specified claim, that for "sequestration/abuse of process." Louisiana law is clear, a settlement "regulate[s] only the differences which appear clearly to be comprehended in them by the intention of the parties . . . unless it be the necessary consequence of what is expressed. . . ." La. C.C. art. 3073. The determination of whether a particular claim was included within the scope of a release is made on the basis of the parties' intent, as expressed in the written document. Smith v. Amedisys, Inc., 298 F.3d 434, 444 (5th Cir. 2002). The language of the Partial Settlement indicates that Morrow & Montemayor's intent was to dismiss all claims against Western American except the Reserved Claims. "Morrow and Montemayor dismiss, with prejudice, all claims against [Western American] which were based on breach of contract and all other claims . . . ."[65]

This conclusion is further bolstered by the extended colloquy this Court conducted with counsel for Morrow & Montemayor prior to accepting the proffered settlement document.

---

[65] Partial Settlement, ¶ 2.

| The Court: | So you are **giving up everything except** you want to be able to sue WAT or reserve your right to sue WAT for defamation and a breach of – **defamation and sequestration/abuse of process** should you have such a claim. |
|---|---|
| Mr. Rountree: | **Exactly.** |
| The Court: | That might arise out of the fact surrounding this contractual dispute; is that right? |
| Mr. Rountree: | And the institution of the lawsuit. |
| The Court: | **Okay. Everything else you are giving up; is that right?** |
| Mr. Rountree: | Yes. |

* * *

| The Court: | **So there are no unasserted claims that Morrow and Montemayor is not giving up, nor any claims that were asserted and ruled upon that Morrow and Montemayor is not giving up, or any claims that Morrow and Montemayor might have made in any forum that Morrow and Montemayor is not giving up except for claims of defamation and sequestration/abuse of process [should that exist] that are sitting before this Court.** |
|---|---|
| Mr. Rountree: | **Correct.**[66] |

While a Court normally is limited to consideration of the four corners of a settlement document in determining whether or not the release of a particular claim was included within the document as intended by the parties, a court can consider extrinsic evidence to ascertain whether the language used in the release was actually intended by the parties when it appears that the releasor is mistaken about the scope of the claims he or she released.[67] To the extent that Morrow & Montemayor's arguments concerning Coverage B are intended to suggest that a claim for wrongful entry into their business premises survived the Partial Settlement that they entered into with Western American, this Court finds that the record in this case is clear that no party to the Partial Settlement expressed any intent to reserve a claim for wrongful entry against either Western American or National Union. No such claim had been asserted up to the point of the Partial Settlement, and the

---

[66] Transcript of Proceedings of March 19, 2003 [Doc. 474], at 568-69 (emphases added).

[67] *See* <u>Smith v. Amedisys, Inc.</u>, 298 F.3d at 445 (5th Cir. 2002).

settlement released all claims except those specifically reserved; the specific reservation of claims included in that release did not include a claim for wrongful entry. Moreover, in that portion of the colloquy conducted in Chambers by this Court quoted above, counsel for Morrow & Montemayor specifically acknowledged – in response to this Court's effort to ascertain the specific nature of the release and the intent of the parties – that all claims which had not been specifically asserted were released under the Partial Settlement. There is no evidence to suggest Morrow & Montemayor reserved a claim for wrongful entry against Western American or against National Union. Thus, this Court finds those claims, even if this Court were to assume them now properly before this Court – which this Court strongly questions – were included within the general dismissal language quoted hereinabove and, thus, were released by Morrow & Montemayor.

In light of the foregoing, this Court finds that the only claims now pending against National Union by Morrow & Montemayor are for the following actions by National Union's insured, Western American:

(a)     wrongful issuance of the writ of sequestration due to the misrepresentations (negligent or intentional) made by Konrad Jackson in association with the issuance of the writ;

(b)     wrongful issuance of the writ of sequestration due to this Court's failure to impose a bond requirement upon Western American as required by the Louisiana Code of Civil Procedure;

(c)     wrongful seizure (or, alternatively, wrongful execution of the writ) due to the representations made by Konrad Jackson to Judge Harmon which led her to allow an expansive interpretation of the scope of the writ of sequestration; and

(d)     wrongful seizure (or, alternatively, wrongful execution of the writ) due to the seizure by the Deputy U.S. Marshal, at the behest of Mr. Jackson, of documents and/or things

outside of the scope of the writ of sequestration.[68]

## 2. *Coverage A*

There are two provisions of the CGL insurance policy that Morrow & Montemayor claim

provide coverage for the claims that they are asserting herein. They are identified as "Coverage A"

and "Coverage B," and will be addressed separately herein. Coverage A insures Western American

against liability that flows from "occurrences" as defined by the policy.

### i.    **Insuring Provisions**

The portions of National Union's CGL Policy relevant to Coverage A for the seizure-related

_____

[68] While the merits of Morrow & Montemayor's claims are not at issue in the pending motion, this Court notes, for the sake of clarity, that the arguments being made by Morrow & Montemayor are biased almost to the point of disingenuousness. As is reflected in the record (Transcript of Telephone Status Conference of December 7, 1999, Doc. 369), this Court's decision not to require Western American to post a bond prior to issuing the writ of sequestration, as normally would be required by La. Code Civ. Proc. art. 3501, was specifically addressed and based upon language included in the Terminal Agreement (a copy of which was entered as WAT Exhibit 12 at trial) permitting and acknowledging the possibility of just that outcome. "Commission Manager agrees that if in the Company's judgment the covenants and agreements are broken, the company will be entitled, in addition to any other rights and remedies, to an injunction or restraining order restraining Commission Manager from committing or continuing to commit any breach of these covenants to the issuance of such injunction or restraining order or other equitable relief *without bond or other security* . . ." WAT Exhibit 12, at 4-5. A second argument Morrow & Montemayor have made repeatedly throughout this litigation is that the writ of sequestration was wrongful because some of the documents or things identified in the writ were neither owned, nor subject to a security interest held by Western American. In making this argument, Morrow & Montemayor ignore the actual language of the applicable codal article – "When one claims the ownership *or right to possession* of property, or a mortgage, security interest lien, or privilege thereon" La. Code Civ. Proc. 3571 – that specifically permits the sequestration of property to which a party claims a right of possession (irrespective of the source of that right). In other words, Morrow & Montemayor argue exclusionary language in Article 3571 which doesn't exist. Yet, perhaps more troubling, a third highly questionable element of argument repeatedly made by Morrow & Montemayor is that Western American did not have any claim or right to possess many of the things listed in the writ of sequestration issued by this Court. This argument pointedly ignores quite specific language contained in the various relevant and disputed truck lease agreements – an exemplar of which was placed into evidence as WAT Exhibit 73 – declaring that, in the event of a breach, many of the specific documents listed and identified in the writ of sequestration must be returned to Western American: "Upon the expiration, cancellation or termination of this AGREEMENT . . . Items to be returned to [Western American] are: (a) SSRS forms . . . (2) Unused Fuel Decals (3) Loads hauled prior to cancellation of lease," etc. to include virtually every category of documents appearing on the writ that issued. *See* Exhibit 73, at Bates Stamp No. 161; Order of December 8, 1999 [Doc. 7].

claims are set forth below:

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1)  **The "bodily injury" or "property damage" is caused by an "occurrence"** that takes place in the "coverage territory," . . . .

## SECTION V - DEFINITIONS

. . .

12.  **"Occurrence" means an accident**, including continuous or repeated exposure to substantially the same general harmful conditions.[69]

Under the terms of Coverage A, therefore, the policy provides protection against liability for bodily injury or property damage only if caused by an "occurrence." National Union argues that Morrow & Montemayor have not alleged an "occurrence" here and, thus, that they cannot recover under Coverage A.

### ii.  Analysis

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in the policy. Under Louisiana law of contract interpretation, a court faced with interpreting an undefined term in a policy must construe that term by applying its "general, ordinary, plain, and proper

_____

[69] CGL Policy, attached as Exhibit 1 to the Memorandum of Law in Support of Motion for Summary Judgment [Doc. 497], at 1 of 13, 10 of 13 and 12 of 14.

-57-

meaning," unless it has acquired a technical meaning. Thermo Terratech, 265 F.3d at 334. The Fifth

Circuit has interpreted the term "accident" in substantially similar circumstances. *See* Adams v.

Unione Mediterranea di Sicurta, 220 F.3d 659 (5th Cir. 2000), *cert. denied sub. nom.* Adams v.

American Eagle Marine, Inc., 531 U.S. 1192 (2001).

The facts in Adams are relatively straight-forward: there was a shipping accident on the

Mississippi River and a load of steel was lost while loaded aboard two barges. One of the

defendants, American Eagle, was contracted by the plaintiff (the owner of the steel) to conduct

salvage operations. After a substantial delay, American Eagle did conduct the salvage operations

but sold the salvage to a third party rather than turn it over to the plaintiff. The plaintiff brought

various claims against American Eagle, specifically alleging negligent conversion. Id. at 664-65.

The plaintiff sought and obtained a judgment against Britamco (American Eagle's general liability

insurer), finding coverage for the negligent conversion its insured had conducted. Id. at 677.

Considering an insurance policy with provisions identical in all pertinent respects to those

found in National Union's policy cited hereinabove – *i.e.*, with the "occurrence" requirement limiting

coverage to "accidents" but without any definition of "accident" in the policy – the Fifth Circuit

found that negligent conversion cannot, as a matter of law, constitute an "occurrence" under the

policy because it is not, by its nature, an "accident." The Court consulted BLACK'S LAW

DICTIONARY 15 (6th ed. 1990) and found that an "accident" is "a fortuitous circumstance, event, or

happening; an event happening without any human agency, or if happening wholly or partly through

human agency, an event which under the circumstances is unusual and unexpected by the person to

whom it happens." Id. at 678. Based upon this conception of "accident," the Court found that the

"transfer, purchase and consumption" of the steel in question "was not an accident or a fortuitous

event. American Eagle's and A.K. Steel's interference constituted more than an accident or unexpected event." Id. Because the human agency involved in negligent conversion occurs under circumstances that are neither unusual nor unexpected, the Court ruled that negligent conversion is not an "accident" and, thus, "is not covered by Britamco's insurance policy." Id.

National Union argues, persuasively, that the analysis applied by the Fifth Circuit to the tort of negligent conversion should apply equally to the two torts asserted herein: wrongful sequestration and abuse of process. Similarly to the negligent conversion that was at issue in Adams, National Union argues there was nothing accidental or fortuitous about the actions allegedly taken by Western American: (a) the alleged misrepresentation (negligent or otherwise) to this Court of the ownership of the documents and other things made the subject of the writ of sequestration; (b) arguments made to this Court and/or to Judge Harmon about the circumstances under which the writ should be issued or executed; and/or (c) the seizure of documents and other things that were clearly beyond the scope of the writ and which, more specifically, this Court had specifically refused to include within the scope of the writ. The acts alleged by Morrow & Montemayor herein, as were the acts in Adams, caused by human agency, and, therefore, no more accidental or fortuitous than the negligent conversion discussed in Adams. In light of the definition and application of the term "accident" adopted by the Fifth Circuit in Adams, this Court finds that under the undisputed facts presented, Morrow and Montemayor have not alleged an "occurrence" for purposes of Coverage A with regard to their seizure-related claims and, therefore, there is no coverage for those claims under that insuring provision.

Morrow & Montemayor make two arguments in an effort to avoid this ruling. The first is based upon the principle articulated by the Fifth Circuit in Ashland Oil, Inc. v. Miller Oil Purchasing

Company, 678 F.2d 1293, 1321 (5ᵗʰ Cir. 1982), that "[i]n the absence of a policy declaration that the occurrence must be accidental from the standpoint of the insured, the Court must evaluate the occurrence from the perspective of the damaged party." While Morrow & Montemayor are correct this principle inheres in the interpretation of the term "occurrence" at issue here, the Fifth Circuit also has ruled that there are certain types of acts – such as conversion (whether intentional or negligent) – are not accidents, no matter from which perspective one interprets them. The determination that the term "accident" must be defined from the perspective of the damaged party is not necessarily a mandate that all other events are an accident, and Morrow & Montemayor have not provided persuasive argument or explanation for why the events should constitute an accident in light of the guidance supplied by the Fifth Circuit.

Morrow & Montemayor's second argument seeks to distinguish Adams on the basis that the damages sought in that case are different from those at issue here. "Morrow and Montemayor do not seek damages for conversion of their property, but rather bodily injuries resulting from conduct of which conversion was incidental. Unlike the loss of property in Adams, which constituted the damages there, bodily injury is alleged to have resulted from a series of events beginning with "scandalous, untrue allegations."[70] This argument is misguided. Coverage A extends to both bodily injury *and* property damage caused by an "occurrence." It is irrelevant whether Morrow & Montemayor seek damages for the conversion itself or for bodily injuries allegedly stemming from that conversion; neither is covered unless there is an "occurrence" which caused them. In the absence of any basis for distinguishing between negligent conversion (as was at issue in Adams) and

---

[70] Memorandum in Opposition to National Union's Third Motion for Summary Judgment [Doc. 504], at 9.

wrongful sequestration and abuse of process (as alleged here), and as Morrow & Montemayor have

not identified any other valid basis upon which this Court could distinguish <u>Adams</u>, this Court finds

the Fifth Circuit's analysis instrumental as applied to the facts of this case.

>   *3.     Coverage B*

The second possible source of coverage for Morrow & Montemayor's claims against

National Union is that provided by "Coverage B" under the CGL Policy.

>   **i.      Insuring Provisions**

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

>   1.      Insuring Agreement
>
>   >   a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. . . .
>   >
>   >   b.      This insurance applies to:
>   >
>   >   >   (1)      "Personal injury" caused by an offense arising out of your business . . . .

**SECTION V – DEFINITIONS**

. . .

>   13.      "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses . . . .
>
>   >   c.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.[71]
>
>   >   **ii.      Analysis**

The coverage provided by Coverage B is substantially unlike that afforded by Coverage A.

---

[71] CGL Policy, attached as Exhibit 1 to the Memorandum in Law in Support of Motion for Summary Judgment [Doc. 497], at 4 of 13, 13 of 13, and 12 of 13.

As recently noted by the Fifth Circuit, "Coverage B personal injury liability insurance differs from Coverage A bodily injury and property damage insurance in at least two important ways. First, unlike Coverage A, Coverage B may be triggered without proof of an accidental occurrence. Instead Coverage B is activated by the commission of certain specified offenses during the policy period. . . . Coverage B expressly extends coverage to liability for 'personal injury' . . . other than 'bodily injury,' caused by certain defined offenses arising out of the insureds' business. Therefore, under Coverage B, the triggering act may be intentional." American Guarantee and Liability Insurance Company v. 1906 Company, 273 F.3d 605,612 (5th Cir. 2001).

While Coverage B, thus, may apply to intentional acts, it, however, does not grant possible coverage to *all* intentional acts. The policy contains a specifically-delineated list identifying those acts which are covered. The list does not include wrongful seizure, abuse of process, or any closely analogous theory of liability or recovery. The only act covered by Coverage B which has been identified by Morrow & Montemayor as possibly relevant here, *interestingly, is "wrongful entry."* According to Morrow & Montemayor, Konrad Jackson wrongfully entered the premises of Morrow & Montemayor, on behalf of Western American, in connection with the seizure of documents and other things. Morrow & Montemayor argues Western American's entry onto their premises in Houston, Texas, on December 10, 1999, for the purpose of participating in the seizure of documents and other things was wrongful because the writ had been wrongfully issued by this Court, and, thus a wrongful entry occurred. However, Morrow & Montemayor have not pled a claim for wrongful entry or properly placed such a claim before this Court, nor will they be permitted to expand the scope of their claims against National Union at this late point in the litigation. Thus, as Morrow & Montemayor have not alleged any act or claim to which Coverage B might apply, this Court finds

that there is no coverage provided, under Coverage B of the CGL Policy, for Morrow & Montemayor's Reserved Claims.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed on behalf of National Union Fire Insurance Company of Louisiana shall be GRANTED and all of the claims asserted by or on behalf of Morrow & Montemayor against National Union will be dismissed with prejudice. Moreover, this Court will formally acknowledge that the Partial Settlement had the legal effect of dismissing all counterclaims by the defendants against Western American Transportation, L.L.C.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this _15_ day of _August_, 2006.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE